## In re UNITED RAILWAYS & ELECTRIC CO. OF BALTIMORE.

No. 8204.

District Court, D. Maryland.

May 27, 1936.

Venable, Baetjer & Howard, of Baltimore, Md. (Edwin G. Baetjer, of Baltimore, Md., of counsel), for First Lien Bondholders' Protective Committee.

Semmes, Bowen & Semmes and Lauchheimer & Lauchheimer, all of Baltimore, Md. (Jesse N. Bowen, of Baltimore, Md., of counsel), for Income Bondholders' Protective Committee.

Emory, Beeuwkes, Skeen & Oppenheimer, of Baltimore, Md. (Reuben Oppenheimer, of Baltimore, Md., of counsel), for Funding Bondholders' Protective Committee.

Edward Duffy, of Baltimore, Md., for Continental Trust Co., Trustee.

Niles, Barton, Morrow & Yost, of Baltimore, Md. (Carlyle Barton, of Baltimore, Md., of counsel), for Maryland Trust Co., Trustee.

Edgar Allan Poe, of Baltimore, Md., for Receivers-Trustees.

WILLIAM C. COLEMAN, District Judge.

This opinion is a supplementary one relating to the reorganization of the United Railways & Electric Company of Baltimore, and specifically to the compensation to be allowed to various parties in interest for services performed in connection with that reorganization.

On June 14, 1935, this court confirmed a plan of reorganization of this company under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). Such confirmation was accompanied by a short opinion summarizing the court's reasons, and, subsequently, on July 18, 1935, there was rendered a detailed opinion ([D.C.] 11 F. Supp. 717) covering the entire reorganization, except the question of compensation to be allowed to the various parties in interest, this question being deferred for future consideration.

Receivers for the debtor company were appointed on January 5, 1933. This receivership continued until April 13, 1935, when resort was had to section 77B of the Bankruptcy Act and reorganization proceedings were thereafter progressed under its provisions. The questions involved during the period of reorganization which, treating the receivership and the trusteeship under section 77B as one and the same, extended over a period of approximately two and a half years were many and complex. These will not here be narrated, because they are amply covered by this court's opinion above referred to.

The plan of reorganization contains no provision with respect to allowances. A large number of applications for allowances of various kinds have been filed with the court. The act (subsection (c) (9) of section 77B, 11 U.S.C.A. § 207 (c) (9), provides that the court "may allow a reasonable compensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers and committees or other representatives of creditors or stockholders, and the attorneys or agents of

any of the foregoing and of the debtor." A few of the applications relate to services, a minor portion of which were performed prior to the commencement of the equity receivership in 1933. A number of them relate to services rendered during as well as after that receivership, to which a separate provision of the act (section 77B, subsec. i, 11 U.S.C.A. § 207 (i) is applicable, as follows: "And the judge shall make such orders as he may deem equitable for the protection of obligations incurred by the receiver or prior trustee and for the payment of such reasonable administrative expenses and allowances in the prior proceeding as may be fixed by the court appointing said receiver or prior trustee." The act further provides (section 77B, subsec. (c) (7), 11 U.S.C.A. § 207 (c) (7) that the court "shall cause reasonable notice of * * * the allowance of fees or expenses, to be given creditors and stockholders by publication or otherwise."

Pursuant to the aforegoing, by order of this court an itemized statement of all the applications that had been made for allowances, showing the amount and character thereof, the period of time covered by same, and what, if any, previous allowance had been made to any of the applicants, was mailed to each of the protective committees of the various bondholders of the debtor company; to the various depositaries; to the trustees under corporate mortgages of the debtor and its subsidiary and controlled companies; to their counsel; to counsel to the trustees of the debtor company, as well as to certain other parties in interest. This statement also contained notification that the court would consider all such applications at a hearing to be held on April 6, 1936. In addition, and pursuant to the same order, an abbreviated notice of the requested allowances and of the hearing relative to same was published three times in three newspapers of general circulation in Baltimore. The statement also contained notification that all such applications for allowances were on file with the clerk of the court and open to the inspection of interested parties. The hearing thus announced was held on April 6, 1936. No parties appeared in person or by counsel to object to any of the requested allowances; nor were any formal petitions of objection filed with the clerk, although a number of letters were received by the court protesting vigorously against some of the requested allowances, but such protests were of a very general character and evidenced no detailed knowledge, or effort to obtain a detailed knowledge, of precisely what services had been performed by the various parties whose requests were opposed.

At the hearing the court, in addition to considering details of the formal applications, with affidavits, that had been filed by each applicant, required verbal presentation to be made of each applicant's claim, and also announced that in each case the court was ready to hear any remarks or testimony by any party in interest whether in support of or in opposition to the requested amount. At the close of the hearing, the court took all the applications under consideration. This opinion now deals with these applications and determines the extent to which each is believed to be reasonable and proper.

The applications now before the court represent the very large sum of $441,442.-02, including requested allowances for disbursements.

There were three protective committees for the security holders of the debtor company, namely: (1) First lien bondholder's protective committee; (2) income bondholders' protective committee; and (3) funding bondholders' protective committee. The members of each of these committees have requested certain allowances for services and expenses, as have also their counsel and depositaries. In addition, allowances on account of services and expenses have been requested by trustees under mortgages of various subsidiary companies of the debtor company and by counsel for such trustees; also, by other counsel, by special masters and by others hereinafter enumerated. Therefore, for convenience, we will divide all of the requests into six major groups as follows, and will take up, in the following order, each particular group and all items relating thereto: (1) Allowances to first lien bondholders' protective committee, counsel, and depositaries; (2) allowances to income bondholders' protective committee, counsel, and depositaries; (3) allowances to funding bondholders' protective committee, counsel, and depositary; (4) allowances to trustees under mortgages of various subsidiary companies and to their counsel; (5) other attorneys' fees; and (6) miscellaneous allowances and expenses.

As this court recently said in Re Consolidation Coal Company, when dealing with similar requests in a similar proceeding (see 14 F.Supp. 845: "Obviously, there is no yardstick or precise rule which a Court, in a proceeding of this kind, may adopt to govern it in determining the reasonableness of such requested allowances. There are, of course, a few fundamental factors which basically must serve as a guide. These are first, the character and extent of the particular services for which compensation is sought; second, the interests that are involved, or, otherwise stated, the assets of the debtor corporation; and third, the results finally attained by the reorganization considered in its entirety, with particular relation to the losses sustained by the company's security-holders and other creditors; or, stated somewhat differently, the fact that the circumstances are not normal, but of a special character because the debtor corporation has had to seek the protection of the Court and has been unable to meet its obligations as they mature, in and of itself obviously requires that what might be allowed for the same services rendered to the same company were it solvent, and operating as a going concern entirely outside of the jurisdiction of the Court, can be no fixed criterion. That is to say, what may customarily be paid, or what may be entirely reasonable, under the latter circumstances, should, in the present instance be taken as at most prima facie persuasive of the rule to be adopted, and in no sense conclusive. In short, in all proceedings of this kind, we must start with the proposition that all allowances, while they must be fair, must, nevertheless, be moderate as opposed to liberal. In its opinion confirming the Plan of Reorganization [in that proceeding], this Court said (11 F.Supp. 594, at 598–599) : 'There seems to have grown up in bankruptcy proceedings generally throughout the country a feeling that it is entirely proper to pay lawyers and others even more in bankruptcy and receivership proceedings than might otherwise be paid, on the theory, apparently, that their work is harder because they are dealing with a very ill patient. This court has never subscribed to that doctrine, and will not do so in this case. The Court has tried up to date to allow to the attorneys involved,— and there has been a large number—fees that have been reasonable compensation for the services rendered, taking always into account, however, that we were dealing with a concern that could not be treated like one in normal times, getting along successfully. Now, that same principle will have to apply with respect to applications for further allowances. In other words, the Court will be very careful to see that these very substantial and very gratifying savings accomplished for the company by the receivership are not wasted, thrown away, or offset by excessive fees. The fees will have to be kept down to a basis which is commensurate with what we are dealing with, namely, a receivership or bankruptcy proceeding. Attorneys and others will have to recognize that fact. I mention this, without knowing what those fees, or certainly a number of them, may be expected to be by the parties applying for them, but they must realize that they will be required to take their share of some of the loss that these stockholders and bondholders of the company have been compelled to share in.' "

## I. Allowances to First Lien Bondholders' Protective Committee, Its Counsel and Depositaries.

We will first consider the requested allowances to the members of this committee, who were Edwin G. Baetjer, chairman, William G. Baker, Jr., Austin McLanahan, and A. H. S. Post and J. J. Nelligan (now deceased, and for whose estate claim is made). The chairman asks for an allowance of $45,000 for his services and for each of the other four members $5,000 is asked, or a total of $65,000 for the committee, and $1,500 to N. H. Streithoff as secretary of the committee. Mr. Baetjer's firm also performed the legal work in connection with eight separate foreclosure proceedings which were progressed to actual foreclosure sales which, however, were never ratified and confirmed, but were annulled, because the receivership was superseded by reorganization proceedings under 77B, throughout which Mr. Baetjer acted both as chairman and counsel of the committee. It is impossible to draw a definite line of separation between these legal services of Mr. Baetjer and his firm, and his services as chairman of the committee. Therefore, a consideration of his request will be momentarily deferred, and taken up in connection with his request for legal fees.

Passing then to the requested allowance of $5,000 to each of the other four members of this committee, they were appointed pursuant to the first lien bondholders'

protective agreement, dated October 1, 1932, that is, several months prior to any assumption by this court of jurisdiction of the affairs of the debtor company, because of their positions of prominence and high regard in the financial community of Baltimore, and, also, because of the considerable amount of bonds of the debtor company which their firms or institutions held, or in the distribution and sale of which they had participated or been interested. Thus, a situation akin to that presented in Re Consolidation Coal Company proceedings, recently before this court and heretofore alluded to, is presented. In the course of its opinion with respect to allowances in that proceeding to members of the protective committee representing holders of first refunding mortgage bonds of the debtor company, this court made the following statements which appear to be pertinent to the present case: "Presumably, they, or their own nominees, would have undertaken the same duties as part of their regular, official obligation to their principals and clients even if all hope of additional reward directly through the Court had been initially denied, and, therefore, these duties may be treated as having been largely, if not entirely, included as part of the work for which they received their salaries or share of firm income,—doubtless large. Thus, to make any allowance to them now out of the Company's assets would be in the nature of an honorarium, and contrary to the letter and spirit of the law which demands economy of administration. The Court is not unmindful of the argument that has been stressed in favor of these allowances, namely, that if men of established reputation and influence in the business world are not compensated for services of this kind, they will be reluctant, if not unwilling to serve, with the result that the personnel of protective committees will decline in character and influence, which in turn will result in inability to obtain assents to proper plans of reorganization without at least much greater difficulty, and expense incident to brokerage fees, which in the present case have been avoided; also, that assuming such persons would, by reason of their previously acquired interest, directly or indirectly, in the securities of the debtor company, have been impelled to serve in any event whether additionally compensated or not, the benefit of their services has not been confined to those interests which they might be said to represent but has been enjoyed gratuitously and thereby unfairly, by all other security-holders represented by the particular committee. In reply, it is sufficient to say, we think, that while such arguments may, in some cases, be very potent, they are not in the present instance, for the reason that the Committee members in question have performed little more than nominal services."

The court also is aware of the fact that the work of this committee extended over a period of approximately three years. However, the work of its members, other than its chairman, was neither continuous nor laborious. Indeed, their services appear to have been primarily of an advisory and consulting character, their chairman assuming the brunt of the work. They met on numerous occasions, but again, it appears that they performed little original work. Under these circumstances, the requested allowance is believed to be excessive, and a fee of $1,000 to each of these four members is believed to be entirely reasonable and proper when tested by the rules heretofore stated, which must apply in a proceeding of this kind. The requested allowance of $1,500 in full payment to Mr. Streithoff for his services as secretary to the committee appears to be reasonable and will, therefore, be granted.

Passing now to a consideration of the request of Mr. Baetjer, chairman of the committee, for an allowance of $45,000, and analyzing this, as we must, in connection with the request of Mr. Baetjer's firm as counsel for the committee, in conducting the foreclosure proceedings and in the reorganization proceedings, for $105,000, plus an additional $31,006.60 for office expenses as such counsel, we are faced with the necessity of determining what is a fair and reasonable allowance to those who performed by far the major portion of all of the work, both administrative and legal, incident to the entire proceedings in this court, that is, from the inception of the receivership in January, 1933, until the final decree was signed in June, 1935, approving the plan of reorganization, because it is undeniably true that Mr. Baetjer and his firm stood in this position.

These attorneys have set forth with meticulous detail the character and extent of such services in their petition and in the testimony of Mr. Baetjer at the hearing. The major problems that faced the receivers and the trustees have been analyzed in the previous opinion of this court and so this analysis will not be repeated here. Suffice it to give the following summary

of the situations with which the committee and its counsel were faced and the results which were accomplished. The first lien bonds, junior lien bonds, collateral trust notes, and other claims consisted of fourteen distinct issues, each differing from the other security in right and value, aggregating over $66,000,000 and distributed among more than 15,000 separate holders. In addition, there was stock of an aggregate par value of $20,000,000, distributed among approximately 1,700 holders. All first lien issues were deposited with this committee. It conducted all foreclosure and other proceedings and prepared the plan covering all issues, including not only the first lien issues, but all junior issues as well. It became necessary for this inexcusably excessive capitalization to be greatly reduced, which, in turn, required that the fourteen different conflicting issues be consolidated into a much smaller number, as a matter of fact, they were reduced to three issues. Also, it became essential for the reorganization to be completed within a relatively short time under penalty of loss of a tax reduction amounting to over $400,000 annually. All of this meant that the plan of reorganization must be so drawn as to command substantially unanimous approval of all of the 15,000 holders of each of the fourteen issues, with respect to the fairness of its provisions. These results were accomplished. The company's capitalization was reduced more than 40 per cent., that is, to approximately $35,000,000; the fifteen separate issues (including the stock) were reduced to three, namely, debentures, preferred, and common stock. No holder of any of the former issues was excluded from participation in the new securities, but the priorities and rights in each issue were properly recognized in the character and amount of the securities allotted, and the company, through the extremely limited amount of its fixed charges, was relieved from the danger of future default. All interested parties had ample notice of hearings and opportunity to have the plan explained to them and to object to any part of it. Prior to the confirmation of the plan, no objection was made on behalf of any holder of any of the fourteen classes of senior and junior bonds, and other claims; and only one objection was received by any stockholder, and that from a holder of a few shares, bought after the appointment of the receivers.

It is obvious that a determination of a correct valuation of the debtor company's entire property and of the mortgage divisions was a difficult and highly technical task. There were special considerations affecting the various issues.

While foreclosure proceedings were never consummated to the point that actual foreclosure sales were ratified, because the receivership was superseded by proceedings under 77B, a large part of the extensive and highly technical work of Mr. Baetjer and his firm related to the foreclosure proceedings and preparation of the elaborate proof and legal details incident thereto. All of the legal details throughout the proceedings under 77B were carried out by these attorneys, including supervision over final distribution of the new securities consisting of more than 60,000 separate registered certificates among the fourteen classes of security holders and claimants, including advice as to the regular and fiduciary transfers of securities, provisions for lost bonds and coupons, and also all usual incidental questions and instructions to depositaries, committees, transfer agents, and registrars.

By the terms of the agreement under which the protective committee acted, it was authorized to determine what expenses should be incurred to attain its objects; to fix the compensation of counsel and of their agents, and to fix their own compensation subject only to the limitation that the total amount of all of the aforegoing should not exceed 1½ per cent. of the aggregate principal amount of the first lien bonds of the debtor company. What is now being requested by the committee (including the $20,000 requested by the four members of the committee in addition to the chairman which has already been considered) is one-half of 1 per cent. of the amount of the first lien bonds and collateral notes. Although this is very substantially below the limit set in the agreement, depositary charges and other expenses are still to be considered, and the terms of that agreement are, of course, not controlling, and the reasonableness of allowances of this nature is not to be determined on a percentage basis when we are dealing in very large figures, but the factors hereinbefore enumerated are the ones which must control, namely: (1) The character and extent of the particular services for which compensation is sought; (2)

the interests, namely, the assets that are involved; and (3) the results finally attained by the reorganization considered in its entirety, with particular relation to the extent of the losses sustained by the company's security holders and other creditors. In short, any given percentage is at most prima facie persuasive of what should be allowed, and is no more conclusive than is what might customarily be paid, or what might be entirely reasonable under normal circumstances, since moderation and not liberality must be the guide.

The total amount asked by Mr. Baetjer and his associates for their services, which we have just analyzed, in addition to the $45,000 requested by Mr. Baetjer for his services as chairman of the protective committee is $136,006.60, or a total of $181,006.60. This is computed as follows: The value of one partner's services alone for one year is computed to be $30,047.18. To this is added an allowance of the partner's share, or one-fourth, of the firm's operating expenses, to wit, $15,204.47, producing a total of $45,251.65 for such services and expenses combined. Since it is maintained that one and one-third partners' full time and expenses were devoted to the work for three years, the total figure of $181,006.60 is reached by multiplying $45,251.65 by one and one-third, and then by three. Stated in another form, with segregation of so much of the entire amount as is allocated to actual out-of-pocket operating expenses as distinguished from partners' compensation alone, we find that $150,000 is given as representing the latter and the balance of $31,006.60 as representing the former.

■ All of the foregoing figures submitted in support of counsel's requested allowances are stated to be actual, except the calculation as to the one and one-third partners' full time claimed to have been involved in the work performed. It was stated that no time records were kept, and, of course, had they been, they would not be conclusive because the services of attorneys in matters of this kind, if indeed in any matters, cannot be gauged by time-clock methods.

■ It is believed that a total fee of $150,000 to Mr. Baetjer and to his firm jointly for all services performed, both by him as chairman of the protective committee, and by him and associates in conducting the foreclosure proceedings and as counsel to the protective committee in all reorganization proceedings, is adequate and proper under all of the circumstances. The work has been highly satisfactory; and the complexity of the questions involved, and the amount of time stated to have been given to it by Mr. Baetjer and his associates is not believed to be overestimated. If performed under different circumstances, the work might have justified allowance of the full amount requested. However, as must be repeatedly emphasized in opinions dealing with this particular and similar reorganizations, customary bases of computation are not controlling. $50,000 for each of three years for the combined services now under review is believed to be both justly compensatory for the skill and time employed and the results obtained, and consistent with other allowances which are herein granted.

In addition to the aforegoing, the first lien bondholders' protective committee has asked for reimbursement of actual and miscellaneous expenses incurred in the amount of $21,498.54, comprising the following: Stationery and mailing $3,558.49; printing $1,906.20; interest on money borrowed for deposit on foreclosure sale, etc., $8,314.17; advertising $5,577.88; other miscellaneous items $2,141.80. Since all of these items appear to have been properly incurred and to be reasonable in amount, reimbursement for same will be granted.

■ In addition, one of the depositaries for this committee, namely, the Safe Deposit & Trust Company of Baltimore, is asking for an allowance of $31,277.08 for services rendered to the committee; and the committee's other depositary, the Mercantile Trust Company of Baltimore, is asking for $38,553.59 for similar services. These items are computed on the basis of $1 per every $1,000 face value of securities handled by the depositary, with no extra charge for issuance and distribution of securities, over a period of approximately three and a half years. While this rate may be entirely reasonable when applied to securities handled in smaller numbers or handled under normal conditions, it is not accepted as the necessary criterion in the present case. This rate has been approved by this court in other 77B proceedings, but not where the amount of the securities was so large. As was said by this court in Re Consolidation Coal Company, 14 F.Supp. 845, "Approval in the several instances, just considered, of the local standard rates is not to be taken as an acceptance of their reasonableness in all cases. When the number of bonds serv-

iced becomes very large, adherence to such rates might not be justified." Such adherence is not believed to be justified in the present proceeding. The depositaries have explained that it is impossible to present, with any degree of accuracy, figures which will show the actual cost of the services rendered. Assuming this to be true, nevertheless under all the circumstances, the present requests are believed to be too high. Too much emphasis appears to be laid upon the total face value of securities handled rather than upon the number of individual accounts; for obviously, where securities are handled in large lots, certain cost factors must decline. Accordingly, the amounts will be reduced by 30 per cent.; that is to say, the Safe Deposit & Trust Company of Baltimore will be allowed $21,893.96 instead of $31,277.08, and the Mercantile Trust Company of Baltimore will be allowed $26,987.51 instead of $38,553.59.

## II. Allowances to Income Bondholders' Protective Committee.

We now turn to the second group of requested allowances, namely, those to the income bondholders' protective committee, consisting of Frank B. Cahn, chairman, and E. Asbury Davis, W. Wallace Lanahan, Sifford Pearre, Julian S. Stein, and Louis S. Zimmerman. First, there is asked by this committee for the services of its chairman $5,000, and $500 each to five other members, and $1,500 to its secretary, making a total of $9,000.

While all six members of this committee are persons of established reputation and recognized ability, it does not appear to the court that any of them performed any services of a creative or extensive or difficult character, but rather that it was inevitable and in the nature of things that they should follow in the lead of what was done, and had to be done, by the dominant committee, namely, the First Lien Bondholders' Protective Committee, whose work we have already closely analyzed. In short, the income bondholders' protective committee acted essentially in an advisory or consulting capacity, and while they had a number of meetings and doubtless performed satisfactorily their obligations to their principals, and aided in bringing about additional consents to the plan of reorganization and in obviating certain objections which might otherwise have been more strenuously voiced with respect to certain features of the plan, nevertheless, in the last analysis, their work was relatively nominal. Accordingly, a request for $9,-000 is believed to be very excessive and will be reduced to a total of $5,000, that is $2,500 to the committee's chairman; $350 to each of the other five members; and $750 to the secretary.

The counsel to the committee, Messrs. Lauchheimer & Lauchheimer, and Messrs. Semmes, Bowen & Semmes, have asked for a total fee to them of $7,500. This likewise is believed to be excessive, for reasons akin to those which have already been discussed in relation to the work of the committee itself. The work done by these attorneys was necessary and doubtless most efficiently performed, but, under the circumstances, and taking into account the relatively secondary importance of what they did, a total fee of $3,500 is believed to be adequate and proper.

The committee incurred expenses of $1,484 for stationery, mailing, and advertising. This item appears to have been properly incurred and will be allowed.

Finally, one of the committee's depositaries, the Maryland Trust Company of Baltimore, has asked for $11,314 for servicing securities, which, however, was performed on a much lower basis, per bond, than were the corresponding services of the two depositaries for the First Lien Bondholders' Committee, heretofore considered. Thus this item will be reduced to $10,920.68, or about 3½ per cent., so as to place the allowance on approximately the same basis, per bond, as the allowances to the depositaries just referred to.

The committee's other depositary, the Equitable Trust Company, asked for an allowance for its services of $2,500, which appears to have been on the $1 per $1,000 basis. Therefore a reduction of 30 per cent. will be made in this item, that is to say $1,750 will be allowed. This depositary has asked for reimbursement for incidental expenses in the amount of $18.90, which will be allowed.

We next turn to the requests of the third committee, namely, the funding bondholders' protective committee.

## III. Funding Bondholders' Protective Committee.

This committee, which consists of John D. Howard, chairman, Abel A. Rosenberg, Donald H. Sherwood, and George M. Kimberly, stands in a position quite similar to that of the income bondholders' protective committee in that its services, while valuable to the security holders whom they represented, and while, because of the confidence which such security hold-

ers rightly placed in the personnel of the committee, deposit of bonds was doubtless facilitated and possible complications in connection with relative rights under the plan of reorganization were obviated, nevertheless, the work of the committee was essentially secondary and nominal in comparison with the work of the first lien bondholders' protective committee. Mr. Howard's committee is requesting $2,000 for himself and $500 each to the three other members, or a total of $3,500. Under the circumstances, this is believed to be excessive. $500 will be allowed to Mr. Howard, chairman, and $350 each to Messrs. Rosenberg, Sherwood, and Kimberly, or a total of $1,550.

Counsel to the funding bondholders' protective committee, Messrs. Emory, Beeuwkes, Skeen & Oppenheimer, have asked for a fee for their legal services in the amount of $5,000. It does not appear that the services of these attorneys was substantially different in character or amount from those performed by counsel to the income bondholders' protective committee to whom $3,500 has been allowed. Accordingly, the same amount will be allowed to Messrs. Emory, Beeuwkes, Skeen & Oppenheimer.

The Maryland Trust Company, depositary for the funding bondholders' protective committee, has asked for an allowance of $3,592.80 for servicing the bonds. Since, again, this company performed these services on a much lower rate, per bond, than that of the other depositaries, approximate equality of allowance will be produced by reducing this item to the extent of only $143.72; i. e., to $3,449.08.

It is appropriate to observe here that the employment of four different trust companies as depositaries for three bondholders' committees prima facie seems to have been unnecessary, and that consolidation of the work should have reduced the cost.

IV. Allowances to Trustees under Mortgages of Various Subsidiary Companies, and to Their Counsel.

Six trustees under various mortgages have requested allowances, namely, Continental Trust Company, trustee under the first consolidated 4 per cent. mortgage; Maryland Trust Company, trustee under the income 4 per cent. and funding 5 per cent. mortgage; Mercantile Trust Company, trustee under Central Railway Company consolidated first mortgage; Maryland Electric Railway Company, first 5 per cent.

mortgage, and Baltimore Traction Company (North Baltimore division) mortgage; Safe Deposit & Trust Company, trustee under Maryland Electric Railway Company 6½ per cent. mortgage; Baltimore Trust Company, trustee (J. D. Hospelhorn, receiver), under Lake Roland Elevated Company first consolidated mortgage and Central Railway extension and improvement mortgage; and Fidelity Trust Company, trustee under Baltimore-Sparrows Point & Chesapeake Railway first mortgage. The allowances requested by each trustee will be taken up in the order above named.

■ Continental Trust Company, Trustee. This company has requested a fee of $10,000 for services in the foreclosure proceedings, filing of proof, and cancellation of bonds. It is believed that enough has already been said with respect to the scope of the foreclosure proceedings, and the work incident to perfecting all details of the final reorganization plan, to indicate that any such amount as $10,000 to this company for what it did, relatively small and unimportant, would be exorbitant. $2,000 would seem to be reasonable and proper compensation. Accordingly, only this amount will be allowed.

■ Mr. Edward Duffy, as counsel for the Continental Trust Company, trustee, in connection with the services for which it has requested compensation, has himself requested a fee of $5,000. Taking into account the amount of time devoted by Mr. Duffy to this work, and the character of the questions involved, as disclosed by his petition and by the facts that were developed at the hearing, and appraising it in relation to the volume and character of work performed by other counsel in this case, it is believed that the requested fee of $5,000 is not excessive. Accordingly, it will be allowed.

■ The Continental Trust Company, as trustee, has also asked to be allowed $2,335.40 for anticipated services in cremation of old bonds. Without determining what amount this trustee may be entitled to for such services, if and when completed, it is apparent that the payment for same should be made by the new company in due course, and is not properly an item to be charged against the assets in the reorganization proceedings. Accordingly, the request will be disallowed.

Maryland Trust Company, Trustee. This trustee has requested a fee of $1,000 for services in foreclosure proceedings.

Tested by the rules hereinbefore discussed, this request appears to be reasonable and will be granted. The same is true with respect to the request for a fee of $500 by Mr. Carlyle Barton, counsel to this trustee. However, this trustee's request for an allowance of $4,998.30 for anticipated services in cremation of bonds is not allowed for the same reasons that a corresponding fee requested by the Continental Trust Company, trustee, is disallowed.

*Mercantile Trust Company, Trustee.* This company acted as trustee under three separate mortgages of subsidiary companies, and has asked for a fee of $500 for services in foreclosing each of these three mortgages, or a total of $1,500. This request appears to be reasonable and will be granted.

*Safe Deposit & Trust Company, Trustee.* This trustee's request is also for $500 for services in foreclosure proceedings in connection with the one mortgage under which it acted. This is believed to be reasonable and will be allowed. An additional sum of $500 is also asked for services in closing the trust. It does not appear that any additional fee has actually been earned in this connection and, therefore, this request will be denied.

*Baltimore Trust Company, Trustee (J. D. Hospelhorn, Receiver).* This trustee acted under two mortgages and is requesting a fee of $500 for services in foreclosure proceedings under each of them, a total of $1,000. This appears to be reasonable and will be allowed.

*Fidelity Trust Company, Trustee.* This trustee is asking a fee of $250 for services in connection with foreclosure proceedings, which is believed to be entirely reasonable and will be allowed.

### V. Other Attorneys' Fees.

The court appointed at the inception of the receivership in January, 1933, three attorneys as counsel to the receivers, Mr. Joseph C. France who, for years, had been general counsel to the company, Mr. Charles McHenry Howard, and Mr. Edgar Allan Poe. Mr. France, who at the time of the receivership was receiving $12,000 a year from the company as general counsel, was allowed the same amount in the receivership with nothing additional, and the same was continued throughout the reorganization proceedings under 77B. However, the other two counsel to the receivers, who were also continued as counsel to the trustees under 77B, were not allowed any fixed salary or rate of compensation, it being provided in the orders of their appointment that they should be reasonably compensated for their services as and when performed. As a result, at various periods allowances were made to them which the court found to be reasonable and proper compensation for the work which had been performed by them up to the respective dates. The total so received by Mr. Poe and Mr. Howard over approximately two and a half years of work was $27,500 each, or $11,000 per year. Mr. Poe is now requesting an additional $5,000, basing his claim primarily upon the extensive and important services which he performed in connection with protracted litigation concerning the railway company's contract for power; concerning very substantial claims of the state roads commission of Maryland; and of the mayor and city council of Baltimore, and also litigation to determine the preferred status vel non of certain receivership funds. However, it is believed that the amount already allowed to Mr. Poe is sufficient for all services performed and therefore the request is denied. Except during relatively short periods throughout the two and one half years of service, Mr. Poe's work was far from requiring his full time. The same is true with respect to Mr. Howard, who was also one of the counsel to the trustees, as above explained. While he has joined with Mr. Poe in the latter's request for this fee and has certified as to its reasonableness in his opinion, Mr. Howard has himself withdrawn his request for any additional allowance, i. e., has requested no additional compensation, apart from his interest in allowances herein made to his firm, and to his partner, Mr. Baetjer.

At this point it is appropriate to set forth what has been paid to the receivers and trustees appointed by the court in this proceeding. Originally, Lucius S. Storrs, former president of the railway company, and William H. Meese, local plant manager of the Western Electric Company, were appointed receivers at an annual salary of $25,000 and $15,000, respectively; that is, their combined compensation per month was $3,333, or over 11 per cent. less than what Mr. Storrs, as president of the company, alone was receiving just prior to the receivership. His former salary was, of course, entirely discontinued throughout these proceedings. These salaries allowed by the court to Messrs. Storrs and Meese continued after they were made

trustees under the 77B proceedings, and until the assets of the old company were transferred to the new one, and operation of the street railway system passed out of this court's jurisdiction. Periodically, the court expressed its views, both publicly and to these receivers-trustees individually, that it did not contemplate making any increase in these salaries, or allowance of any additional compensation for their services either during or at the close of the proceedings. None has been made. No applications for the same are before the court.

■ The banking firm of Alexander Brown & Sons has filed application for an allowance of $1,500 to reimburse it for payment of this sum which it made to its counsel, Messrs. Piper, Carey & Hall, for legal services in connection with various matters incident to the reorganization, with particular relation to one issue of underlying bonds, with the sale of which this banking firm had been connected. In the reorganization proceedings, no separate committee was organized to represent the holders of these bonds, but this banking firm in effect substituted itself for such committee, and while it has made no request for an allowance to itself, it is stated that the services and advice of counsel was rather extensively required in respect to the comparative rights of the holders of the bonds in question, in the reorganization proceedings. This appears to be true, and the fee paid by this banking firm to its counsel appears to be reasonable. Therefore, it will be allowed reimbursement for same.

### VI. Miscellaneous Allowances and Expenses.

A. *To Special Masters.* During the last five months of the reorganization proceedings, the court, at its own instance, but with the approval of the trustees, employed the services of a special master, Charles W. Chase, president of the Indianapolis Street Railway Company, at a total compensation of $15,000, plus actual traveling and other reasonable expenses, which aggregated $2,727.25. Mr. Chase and a staff of several assistants and accountants of long experience made a most thorough and complete survey of the entire street railway situation in Baltimore and embodied the same in a lengthy detailed report to the court, together with recommendations as to what, in the opinion of the special master, should be done in order to rehabilitate the company. The court found the special master's work of very great help to it in connection with the reorganization, and believed, and so stated in its opinion of July 18, 1935, that at least the basic recommendations of the special master should be carried out by the new management. Parenthetically, it may be noted that the court is not advised to what extent, if at all, they have been or will be adopted.

■ Louis J. Burger was also appointed a special master for the purpose of completing the details incident to and the conducting of the sales under the foreclosure proceedings, which sales, as hereinbefore stated, were made but never ratified because the equity receivership was superseded by reorganization proceedings under section 77B. In addition, he was appointed to examine all claims filed in these proceedings, and report thereon as to whether they were in shape for allowance. For these services, which extended over a number of weeks and required a considerable amount of detailed auditing, Mr. Burger has asked for an allowance of $2,000. This amount appears to be reasonable under the circumstances, and will be allowed.

B. *To Auditor, Accountants, Auctioneer, etc.* As a result of the very satisfactory manner in which the books and accounts of the debtor company were found to have been kept, no material departure in this respect was found to be necessary as a result of the reorganization proceedings. The customary periodical audits were continued, but some additional auditing was found necessary in connection with the receivers' report. For this, the services of Charles C. Croggin were engaged, and he has asked for an allowance of $600 for same, which appears to be reasonable and will be allowed. Also, additional services of accountants regularly employed by the company were found requisite, for which these accountants are asking $1,950. This amount also is found to have been earned, and to be reasonable under the circumstances, and will, therefore, be allowed. The same is true with respect to additional costs in the amount of $401.20, representing outlay for printing in connection with prosecution of the litigation in connection with the company's power contract.

■ In connection with the public sale of the debtor company's properties under the foreclosure proceedings, which Mr. Burger, special master, conducted, the services of a professional auctioneer were

desirable and authorized, for which the company asks an allowance of $1,500. This is believed to be excessive and is not approved. The services of the auctioneer were mechanical, and required no real previous knowledge or study. Therefore, to allow the requested compensation for such services which did not consume more than one working day, with no "outside" bidders, and no real responsibility because that was borne by the special master, is believed to be unjustified. Furthermore, it is contrary to the scale of auctioneers' fees approved and made effective by this court by Bankruptcy Rule No. 6, which reads as follows and which, in 77B proceedings, should be adhered to in so far as it is reasonable and practical so to do:

"The following allowances may be made to auctioneers making sales under orders or decrees in bankruptcy, viz:

"For offering and selling real and leasehold estate:

"For the offering where no sale is
effected ......................$ 10.00
"For the first piece sold at any offering where the amount of sale is
not above $500.00............. 10.00
"Where above $500 and not over
$1,000 ....................... 15.00
"Where above $1,000 and not over
$3,000 ....................... 20.00
"Where above $3,000 and not over
$5,000 ....................... 25.00
"Where above $5,000 and not over
$10,000 ...................... 30.00
"Where above $10,000 and not over
$30,000 ...................... 50.00
"Where above $30,000 and not over
$50,000 ...................... 75.00
"Where above $50,000............ 100.00

"Provided, that in cases where more than one piece shall be sold under the same decree, at the same time and place, and the aggregate of allowances by the above scale shall exceed $100.00 then the said allowances shall be the subject of modification according to the circumstances of each case."

It will be seen from the above rule that it was never intended that the services should be measured merely by the amount involved in the sale, beyond a certain point. That is to say, by no reasonable interpretation of the above rule should an auctioneer receive substantially more than $100 compensation merely because the piece or pieces of property which he has been called upon to auction off exceed $50,000 in val-

ue. On the contrary, anything over $100 allowed must be based primarily upon whether his duties and responsibilities have been materially increased. Tested by these standards, the court believes that a fee of $500 is ample, reasonable compensation for the services which the auctioneer in the present proceeding performed.

Finally, the question has been presented to the court for determination as to whether certain other allowances should be approved as part of the present proceedings, namely, allowances covering various expenses, some of which are strictly reorganization expenses, and others, post-reorganization expenses. However, it is difficult to separate accurately the two types of expenses because in the broad sense both types relate to the carrying out of the plan of reorganization.

■ These requested allowances total, including actual disbursements, $44,592.84. Of this amount $21,150.24 represents so-called unapportioned expenses, that is, certain expenses incurred after final confirmation of the plan, consisting chiefly of printing, transfer agents' and registrars' charges; stock exchange charges for listing new securities and the like. All of these expenses appear to have been properly incurred as unavoidable incidents to the reorganization and therefore will be allowed.

The balance of the total sum, to wit, $23,442.60, for which allowance has been requested or suggested, includes the four following items for services rendered: (1) Services of the Safe Deposit & Trust Company of Baltimore rendered in connection with its certification as trustee under the indenture pursuant to which the debentures of the new company were issued; and registration and issuance of the debentures by it as transfer agent, $12,079.75; (2) similar services rendered by the Mercantile Trust Company of Baltimore as agent for the voting trustees with respect to the preferred and common stock voting trust certificates, $5,847.50; (3) services rendered by the Baltimore National Bank as registrar for the voting trust certificates, $3,015.35; and (4) services rendered by Messrs. Lybrand, Ross Bros. & Montgomery, accountants, in supervising the entire work of preparing the debentures and certificates, and their registration and delivery, $2,500.

Item (1) above clearly includes services in connection with a number of matters which are not properly to be treated as in-

cident to the reorganization; as, for example, maintenance of ownership ledger accounts after July 1, 1935, and preparation and distribution of interest checks after that date. As disclosed by the bills which have been rendered by the Safe Deposit & Trust Company, it appears that of this item of $12,079.75, only $8,603.73 is properly allocable to the present proceeding. This latter amount is found to be reasonable for the services performed, it being computed on rates considerably less than the standard rates hereinbefore disapproved, and so will be allowed.

With respect to item (2) above, which represents charges of the Mercantile Trust Company of Baltimore, these charges are likewise found to be computed on rates considerably lower than the standard rates, and to be reasonable, as evidenced by the detailed bills submitted, and are properly allocated to this proceeding, and so will be allowed.

As to item (3) above, namely, the fee requested by the Baltimore National Bank as registrar for the voting trust certificates, namely, $3,015.35, this is believed to be excessive in the absence of submission of any figures showing the actual cost of this service. Therefore, for the same reasons which have heretofore been given in requiring a reduction of 15 per cent. from the amount requested by the various trust companies for their services as depositaries in this proceeding, this item will be subjected to a similar reduction, that is to say, $3,015.35 less 30 per cent., or $2,110.75 will be allowed.

Lastly, the item (4) above, namely, $2,500, as requested by Messrs. Lybrand, Ross Bros. & Montgomery, for supervisory services above referred to, will be allowed because the same is found to be a reasonable expense, properly incurred under the circumstances.

A summary is appended showing the various sums that have been requested, and those that are allowed.

An order will be signed in accordance with this opinion.

| | Asked | | Allowed | |
| --- | --- | --- | --- | --- |
| | Fee | Disbursements | Fee | Disbursements |
| First Lien Bondholders' Protective Committee | $ 66,500 | $21,498.54 | $ 5,500.00 | $21,498.54 |
| First Lien Bondholders' Protective Committee Counsel | 136,006.60 | | 150,000.00 | |
| First Lien Bondholders' Protective Committee Depositaries | 69,830.67 | 841.52 | 48,881.47 | 841.52 |
| Income Bondholders' Protective Committee | 9,000 | 1,484.00 | 5,000.00 | 1,484.00 |
| Income Bondholders' Protective Committee Counsel | 7,500 | | 3,500.00 | |
| Income Bondholders' Protective Committee Depositaries | 13,814 | 18.90 | 12,670.68 | 18.90 |
| Funding Bondholders' Protective Committee | 3,500 | | 1,550.00 | |
| Funding Bondholders' Protective Committee Counsel | 5,000 | | 3,500.00 | |
| Funding Bondholders' Protective Committee Depositary | 3,592.86 | | 3,449.08 | |
| Mortgage Trustees | | | | |
| (1) Continental Trust Co. | 12,335.40 | | 2,000.00 | |
| Continental Trust Counsel | 5,000.00 | | 5,000.00 | |
| (2) Maryland Trust Co. | 5,998.30 | | 1,000.00 | |
| Maryland Trust Co. Counsel | 509.00 | | 500.00 | |
| (3) Mercantile Trust Co. | 1,500.00 | | 1,500.00 | |
| (4) Safe Deposit & Trust Co. | 1,000.00 | | 500.00 | |
| (5) Baltimore Trust Co. | 1,000.00 | | 1,000.00 | |
| (6) Fidelity Trust Co. | 250.00 | | 250.00 | |
| Other Attorneys' Fees | | | | |
| Edgar Allan Poe | 5,000.00 | | | |
| Piper, Carey & Hall | 1,500.00 | | 1,500.00 | |
| Miscellaneous Allowances & Expenses | | | | |
| 1. Special Masters | 17,000.00 | 2,727.25 | 17,000.00 | 2,727.25 |
| 2. Auditor | 600.00 | | 600.00 | |
| 3. Accountants | 1,950.00 | | 1,950.00 | |
| 4. Printing | | 401.20 | | 401.20 |
| 5. Auctioneer | 1,500.00 | | 500.00 | |
| 6. In Re Issuance and Distribution of New Securities | 23,442.60 | 21,150.24 | 19,061.98 | 21,150.24 |
| | $393,320.37 | $48,121.65 | $286,413.21 | $48,121.65 |