## In re CONSOLIDATION COAL CO.

### No. 7850.

District Court, D. Maryland.
July 10, 1935.

Venable, Baetjer & Howard and Harry N. Baetjer, all of Baltimore, Md., for Bondholders' Protective Committee.

Clarence K. Bowie & Daniel B. Leonard, of Baltimore, Md., for Elkhorn Coal Corporation and Mercantile Trust Co., Baltimore, Md., trustee.

Kenneth B. Johnston, of Columbus, Ohio, and Emory H. Niles, of Baltimore, Md., for Committee of George A. Davisam, Glenn S. Pierce, Lucille Graner, and A. H. Thomas.

George Washington Williams and Isaac T. Parks, both of Baltimore, Md., for Harry R. Ruse & Co.

George M. Alexander, of Fairmount, W. Va., for West Virginia stockholders.

Semmes, Bowen & Semmes, Frederick W. Brune, and W. Randall Compton, all of Baltimore, Md., for the trustees.

Alfred N. Heuston (of White & Case), of New York City, and Charles Markell, of Baltimore, Md., for Bankers Trust Co. of New York.

Marbury, Gosnell & Williams and L. Vernon Miller, all of Baltimore, Md., for 4½ per cent. Refunding Bondholders Committee.

G. Campbell Becket (of Davis, Polk, Wardwell, Gardiner & Reed), of New York City, and Robert Stinson, of Baltimore, Md., for Guaranty Trust Co. of New York, trustee for 5 per cent. Bondholders.

WILLIAM C. COLEMAN, District Judge.

The question before the court is whether the plan of reorganization, proposed by creditors of the Consolidation Coal Company, should be approved.

The obligation imposed upon federal courts under section 77B of the Bankruptcy Act, as amended in 1934 (11 USCA § 207), relating to the reorganization of corporations, is a very heavy one; and this court approaches the problem presented in the present case with a full realization of that obligation and of its duty to all parties in interest.

The company has been under the direction of this court for more than three years, during which time the court has had full opportunity to become conversant with the many problems incident to a successful reorganization, a number of which problems have been greatly aggravated by the era of extravagance in the management of the company's affairs which preceded the receivership in June, 1932, this receivership being merged later in proceedings under section 77B.

All requirements of the law appear to have been met with respect to notice to creditors and stockholders of every class in connection with the proposed plan which has been filed by the creditors, and which is now before the court; and all parties in interest have been afforded full opportunity, as the law requires, at this extended hearing to be heard with respect to every feature of the plan.

The court has given very careful consideration to all the details of the plan and to the evidence in support of it which has been submitted. Likewise, the court has carefully weighed the objections to the plan which have been filed. These objections may be summarized as being twofold: The first and primary one being the objection on the part of the owners of some 40,000 shares of the common stock of the company, who, without having presented any single, concrete plan, except to ask for some stock, without having to pay for it, or some sort of a junior security, assert that the common stockholders have been unjustly discriminated against by the allotment to them of warrants, giving them merely the right to subscribe to the new common stock at $25 a share, which will be hereafter referred to; and, secondly, the protest on the part of certain holders of 5 per cent. bonds, to the effect that section 77B of the Bankruptcy Act is unconstitutional, and that, in addition, the lien of these bondholders should not be curtailed, as the plan provides, which is hereinafter more specifically referred to.

It is proper, before considering the plan on its merits, to take up the question of the constitutionality of the law under which we have been proceeding. While it is true that the Supreme Court has not yet passed on section 77B of the Bankruptcy Act, the Circuit Court of Appeals for the Fourth Circuit in its decision in the Alleghany Corporation Case, on appeal from this District, announced very recently, upheld the constitutionality of this act [Campbell v. Alleghany Corporation, 75 F.(2d) 947]; and since its conclusion is binding upon this court unless and until modified or reversed by the

Supreme Court, nothing more need be said at this time. Counsel for the objecting bondholders assert, however, that since the Alleghany Corporation decision was rendered prior to the date of the Supreme Court's decision declaring the Frazier-Lemke provision of the Bankruptcy Act (section 75 (s), 11 USCA § 203 (s) unconstitutional, and since, as it is asserted, the two acts are similar in their fundamental purposes, the question of the constitutionality of section 77B should not be considered as precluded. We, however, believe that it is, because we find no similarity between the two acts, or in the objects sought to be attained by each. Their dissimilarity is so obvious as to require, we believe, no further review at this time.

■ Summarizing our conclusions, we find that the objections which have been raised to the plan are not of sufficient merit to warrant its modification, and finding that the plan is fair and equitable and does not discriminate unfairly in favor of any class of creditors, or any class of stockholders, and that it is feasible and will, under all of the existing circumstances, afford a very satisfactory method for reducing the company's excessive capitalization and for rehabilitating its business, in the light of the best prognosis as to the future of a greatly crippled industry, we are now prepared to ratify the plan.

The statutory prerequisites as to assents have been more than met. That is to say, the assents are as follows: 73 per cent. of the 5 per cent. bonds; 82 per cent. of the 4½ per cent. bonds; 97 per cent. of the preferred stock; 68 per cent. of the common stock; and all of the collateral notes.

It is further very significant that out of 1,608 separate holders of the common stock, 618 have assented, or some 38 per cent. Five hundred and thirty-three of the total number of common stock shareholders held less than 10 shares. One thousand and seventy-five held more than 10 shares, of which 467, or roughly 43 per cent., have deposited.

A brief analysis of the existing, as contrasted with the proposed financial structure, discloses the following:

Existing:
5% Secured Gold Notes..... $ 4,000,000
Refunding 4½% Bonds..... 3,398,000

First and Refunding 5%
  Bonds ..................... 18,733,000   $26,131,000.00

Preferred Stock............. $10,000,000
Common Stock.............. 40,015,748   $50,015,748.00
Miscellaneous   debt—Current ..................... 166,623.62

                                          $76,313,371.62

Proposed:
  Notes—15 Yr. 5%............ $ 4,000,000
  Bonds—25 Yr. 5%*......... 9,192,200
  Preferred Stock**.......... 6,639,300
  Common Stock—p. v. $25*** 7,634,450   $27,465,950.00

*Income bonds for three years.
**Non-cumulative
***Additional Common Stock reserved—
  (1) for conversion of Preferred...... 265,572   shs.
  (2) for exercise of "warrants"....... 100,039.37 shs.

The plan of reorganization summarized contemplates the following exchanges and adjustments of holdings:

RETURN TO EXISTING BONDHOLDERS AND PREFERRED STOCK.

Refunding 4½—................................. $1,000.00
  Acc. interest—June 1/35..................... 142.50

                                              $1,142.50

Receive
  New Bonds......................... 500
  3 Shs. Pref........................ 300   800.00

                                           $ 342.50

9 Shs. Com. : 38.05

i. e., the common stock must sell for $38.05 per share, in order that the refunding bondholder may receive the principal and interest on his investment.

First and Refunding 5—..................... $1,000.00
  Acc. interest to June 1/35................... 175.00

                                              $1,175.00

Receive
  New Bonds..................,........ 400
  3 Shs. Pref........................ 300   700.00

                                           $ 475.00

12 Shs. Com. @ 39.58

i. e., the common stock must sell for $39.58 per share in order that the holder may receive the amount of his investment—principal and interest.

Preferred Stockholder—10 Shs................ $1,000.00
Acc. Dividends............................... 670.00

                                              $1,670.00

Receives 5 shares new common which must sell at $200 per share in order that he may receive the amount of his investment, and at $334 per share in order that he may receive his investment and accrued dividends.

The reduction of the funded debt and the capital stock under the reorganization from $76,000,000 to $27,000,000, in round figures, is based upon a write-down of the capital assets of the company as carried on its books from $60,000,000 to

something less than $33,000,000. At the hearing, this valuation was criticized on the ground that it is not supported by sufficient data compiled by competent, impartial sources. The court believes that this criticism is not justified. It is true that no very recent outside appraisal of the company's properties has been made; and, in fact, the court, after giving careful consideration to the question as to whether the same was necessary, instructed the receivers and trustees that the cost of procuring same would be an unjustifiable waste of the company's money, because such an appraisal would, the court thought, add little, if any, additional value to the figures which had already been carefully prepared by the company's officials, particularly in view of the fact that the real worth of assets of any such industrial corporation depends, in the last analysis, upon its earning capacity.

The court believes that the value of approximately $33,000,000 placed upon the company's assets is sufficiently accurate for the purposes of these proceedings.

What has already been said would seem to be a sufficient answer to the contention of the objecting common stockholders that they should be accorded greater rights, but if the position of the bondholders be further analyzed, the evidence is even more convincing against this contention, and to the effect that there is no real equity for the old common stockholders. That is to say, if we take into account the funded debt and the interest thereon in arrears; the collateral notes and the preferred stock and the dividends thereon in arrears, we find that the company has a total debt due to the bondholders senior to the common stock of more than $46,000,000.

The average earnings of the company for the eleven years, 1924 to 1934, inclusive, were roughly $999,000; and the average earnings for 1930 to 1934, inclusive, were only $587,132. Thus, it will be seen that the company earned on the amount senior to the common stock, without taking into account the amount which the senior security holders of the company would be entitled to receive annually, before any return to the common stockholders is allowed, namely, some $2,500,-000, an average return of approximately only 2 per cent.; and in no single year from 1924 to 1934 did the company earn thereon as much as 4½ per cent.

The bondholders' committee have urged, and not without force, that it would not have been unreasonable to have provided in the plan that the old common stockholders be required to pay $40 in place of $25 for the new common stock, the former being the price that the new bondholders must obtain in order to get back the principal of their bonds with accrued interest thereon, this being on the assumption that their bonds and noncumulative preferred stock are worth par, which is an unwarranted assumption at this time.

It should be noted that interest on the new bonds will be at the rate of 5 per cent. per annum, but from July 1, 1935, to the end of 1937, payable only to the extent earned, although cumulative to the extent not paid. This would seem to be a wise provision, in order to give the company an opportunity to really prove what its earning capacity may be.

The point has been stressed that nearly 50 per cent. of the common stock is owned or controlled by the Rockefeller interests, and that their assents to the plan and to treating the common stock as virtually worthless must be discounted; but there is no showing in the present proceeding of any improper or sinister motives or influence by these interests. And they are, therefore, entitled to recognition, unbiased by considerations due merely to wealth or influence. It is significant that in 1932 the Internal Revenue Department treated this stock for tax purposes as worthless.

Turning now to the second objection raised by the plan, namely, the one made on behalf of certain of the bondholders that the property should be mortgaged for a higher percentage than is proposed, and that the bonds might then be income bonds, suffice it to say that the court is not disposed to disturb the ratios found in the plan, especially when it has been approved by such a large percentage of both classes of bonds, and since there would seem to be much weight in the contention that the credit of the company may much better be maintained under a smaller rather than a larger lien against those assets, and that a market for a security of the proposed type, namely income bond, would probably not exist.

Finally, we turn to the question of the control of the company, because although

there has been no serious objection raised to this aspect of the plan, it is a vital one in all such reorganizations, and, therefore, should not be approved by the court, even though not objected to by any party in interest, if not believed by the court to be fundamentally sound.

In the plan, control is vested in a voting trust of five trustees, the life of the trusteeship being five years. As a result of the evidence which has been introduced with respect to the character and the standing of the trustees named in the plan, the court believes that they are sufficiently representative of the various interests involved, competent to guide the affairs of the new company, and fully cognizant of the absolute necessity for correcting what has occurred in the past, in so far as it may be corrected. Only one of these five voting trustees was a member of the board of directors of the old company, at the time the receivership commenced in this court.

Finally, and in this same connection, the court feels that it will not have performed its full duty in connection with this reorganization if it does not call attention to the shameful extravagance which existed in the operation of this company for years prior and even up to the receivership. This may best be done briefly by pointing out that in the first full year of the receivership, namely, 1933, under the court's direction, there was accomplished a saving of $803,000 in the administrative overhead of the company as against the year 1931, by which latter time there had been a very definite decline in production in the coal industry and in the earnings of the company. As compared with the year 1930, the saving amounted to $885,000. From the point of view of the salaries alone, we find that the corresponding savings were $570,-000 and $639,000, respectively, which have been accomplished without laying off as many as fifty persons in the administrative departments. It is also particularly significant that in the year 1934, even though earnings from operations more than doubled, salaries were increased less than $6,000 over those paid in 1933.

The history and development of this company has not been narrated, nor does it seem necessary to do so at this time. It presents a tragic picture of a company first expanding its operations in the first decade of the Twentieth Century to a vast extent, until its profits exceeded almost the dreams of avarice, and the mere mention of the company's securities became virtually synonymous with the term "safe investment." But this expansion, unfortunately, was followed by over-capitalization, mismanagement, exorbitant salaries, and wasting of the company's assets in various other ways.

These conditions, while totally indefensible, and representing a very black page in the history of a great industry, are not, of course, entirely responsible for the company's present condition. The great decline in the demand for coal, and, therefore, in its production (nearly 40 per cent. since 1918), is the primary cause, which the most enlightened and farseeing management could not forestall. But improvident management and a grossly inflated financial structure have contributed, in very large measure, to the company's collapse. There must be no repetition of these curable conditions.

This leads me finally, recognizing that there will be submitted petitions for the allowances of certain fees and the payments to committee members and attorneys, to sound a note of warning with respect thereto. There seems to have grown up in bankruptcy proceedings generally throughout the country a feeling that it is entirely proper to pay lawyers and others even more in bankruptcy and receivership proceedings than might otherwise be paid, on the theory, apparently, that their work is harder because they are dealing with a very ill patient. This court has never subscribed to that doctrine, and will not do so in this case. The court has tried up to date to allow to the attorneys involved—and there has been a large number—fees that have been reasonable compensation for the services rendered, taking always into account, however, that we were dealing with a concern that could not be treated like one in normal times, getting along successfully. Now, that same principle will have to apply with respect to applications for further allowances. In other words, the court will be very careful to see that these very substantial and very gratifying savings accomplished for the company by the receivership are not wasted, thrown away, or offset by excessive fees. The fees will have to be kept down to a basis which is commensurate with what we are dealing with, namely, a receivership or bank-

ruptcy proceeding. Attorneys and others will have to recognize that fact. I mention this, without knowing what those fees, or certainly a number of them, may be expected to be by the parties applying for them, but they must realize that they will be required to take their share of some of the loss that these stockholders and bondholders of the company have been compelled to share in.

The court will sign a decree in accordance with the opinion just rendered.