In re NEW YORK RAILWAYS CORPORATION.*

BRUKENFELD et al. v. NEW YORK RYS. CORPORATION et al.

No. 322.

Circuit Court of Appeals, Second Circuit.

March 27, 1936.

*Writ of certiorari denied 56 S. Ct. 959, 80 L. Ed. —.

Karelsen & Karelsen, of New York City (Godfrey Goldmark, Frank E. Karelsen, Jr., Max J. Rubin, Frederick Baum, and Max Freund, all of New York City,

of counsel), for preferred stockholders' committee.

Shaine & Weinrib, of New York City (Edward C. Weinrib and Edward J. Mallin, both of New York City, of counsel), for preferred stockholders' protective committee.

Cotton, Franklin, Wright & Gordon, of New York City (Boykin C. Wright and J. A. Fowler, Jr., both of New York City, of counsel), for debtor-appellee.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Edwin S. S. Sunderland and Thomas O'G. FitzGibbon, both of New York City, of counsel), for Guaranty Trust Co. of New York, as trustees under income mortgage.

Cravath, De Gersdorff, Swaine & Wood, of New York City (Robert T. Swaine, Edward S. Pinney, and Herbert J. Jacobi, all of New York City, of counsel), for managers under the plan.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

Appellants are two committees representing preferred stockholders and appeal from orders entered below, questioning whether the debtor was insolvent and whether the plan of reorganization is fair and equitable. The special master heard the proofs and held that the debtor was insolvent and that the plan proposed was fair and equitable. The District Court confirmed his report.

The balance sheet of December 31, 1934, submitted with the petition, showed that the debtor had liabilities amounting to $40,982,342.03 and assets of $31,762,050.99. The balance sheet, showing the condition of the company as of the date of the petition, July, 1935, shows a reduction in assets to $23,720,439.36, with a capital deficiency of over seventeen millions. The physical equipment of the debtor, such as tracks, etc., is included at book value based on reproduction cost determined in the 1925 and subsequent additions at cost, amounting to $19,912,458.51.

The appellants' first objection as to the master's report is his failure to find that the Fifth Avenue Coach Company held about $11,114,831.88 in income bonds with $7,057,918.24 accumulated interest thereon as constructive trustees for the New York Railways Company and for them, as preferred stockholders.

When the debtor reorganized in 1924, it cut down a ninety-one million dollar capitalization to bonds of thirty-eight millions and certain no par value stock, 90,-000 shares of voting common, and 170,000 issued shares of nonvoting stock preferred as to dividends but not as to assets. The new company owned the stock of seven subsidiary companies; the bonds of the system consisting of fourteen millions in bonds of some of these subsidiaries, four millions senior bonds, and twenty millions income bonds. It is plain that the debtor was overcapitalized. It fell behind about a million dollars yearly, the operating revenues failing by that amount to keep pace with the interest on the income bonds. Its passenger revenues fell off from $7,-252,079.03 in 1925 to $4,428,056.49 in 1934. Motorization presented a possible solution, and a bus treaty was entered into with the Fifth Avenue Coach Company in 1926.

Shortly after that, the Fifth Avenue Coach Company bought all the voting (common) stock of the New York Railways Company at $10 per share, securing the approval of the Transit Commission on the basis of the reproduction costs formerly used. At the first subsequent election, the majority of the directors of the New York Railways Company elected were interested as directors or officers of the Fifth Avenue Coach Company or its affiliates.

In 1930 a resolution was passed by the debtor's board still dominated by the Fifth Avenue Coach Company, approving the selection, for the purpose of making a reorganization survey of two banking firms which became managers of the plan of reorganization. Each firm had a member on the boards of the debtor and the Fifth Avenue Coach Company. The Fifth Avenue Coach Company adopted a similar resolution and guaranteed the payment of the bankers' fees payable by the debtor. On the advice of the reorganization managers, the debtor bought in some eight millions of its subsidiaries' bonds, at about one and a quarter million dollars to preserve its operating system and prevent foreclosure. Both companies were contemplating motorization, and the reorganization was conducted with this in mind. It became apparent that there was no equity in the stock, as one reorganization manager said, because the city of New York was not going to give liberal bus franchises. On his recommendation, the Fifth Avenue Coach Company began to buy income bonds in September, 1933. These purchases were made through public advertisement, and the Fifth Avenue Coach Company succeeded in acquiring about eleven millions at an average price of 10 per cent. of their face value. The bonds were on the exchange, and their prices have always been far below face value. Before the Fifth Avenue Coach Company acquired any of the bonds, its position on the board of the debtor had changed. After April, 1933, there were sixteen directors, eight of these are not shown to have had any connection with the Fifth Avenue Coach Company and two others had previously terminated their coach company directorships. Thus, although the Fifth Avenue Coach Company had complete voting control, it did not have a majority on the board. Although appellants assert a majority of the debtors' executive committee at that time were interested in the Fifth Avenue Coach Company, it is apparent that the directors could have authorized the debtors' purchase of the income bonds without the executive committees' cooperation.

From these facts, it is clear enough that there is no basis for the contention that the Fifth Avenue Coach Company was in any fiduciary relationship such as would make directors liable for taking advantage of their position within the rule of Irving Trust Co. v. Deutsch, 73 F.(2d) 121 (C.C.A.2), or In re McCrory Stores Corporation, 12 F.Supp. 267 (D.C.S.D.N.Y.). The Fifth Avenue Coach Company had not so usurped the management of the debtor that the board of directors were influenced to inaction and silence on any plan for the debtor itself to buy in its income bonds at a low figure. The failure of the debtor to so act was undoubtedly due to its financial inability rather than to any other fiduciary faithlessness.

The situation was that there were bonds of the corporation outstanding prior to the income bonds and any money directed for their purchase would weaken the security for this prior issue. Moreover, if any accumulated income were used in the purchase, we would have the situation of interest payments on the income bonds being held up and their value dropping as an inevitable result and then the purchase out of income of these bonds depressed by the default. Article 13, § 1, of the income indenture, is directed against such a possibility. The provisions of article 5, § 5, allowing, before determination of available

net income, the deduction of "reserves for unascertainable items or existing or future contingencies (including without limitation the retirement or amortization of Underlying Bonds, Prior Lien Bonds or other capital obligations)" cannot be read so as to make the ambiguous "other capital obligations" include the very income bonds themselves.

■ There had been $400,000 paid to one of the debtor's subsidiaries, 42nd Street Ferry, for the condemnation of some real estate. Appellants contend that this should have been voted as a dividend, since the debtor had the ferry company's stock and had the power to vote it, although the stock was pledged under the prior lien indenture. Since the debtor had spent over a million dollars in retiring subsidiary bonds by December, 1933, by article 3, § 3, of the prior lien indenture, it was entitled to an equivalent amount of additional prior lien bonds. Article 7, § 4, provides that the debtor, instead of accepting such prior lien bonds, could take any cash distributions for the pledged stock "paid otherwise than out of current earnings or earned surplus of the company issuing such stock." This would be done by drawing the sum off through the income bond trustee who was authorized to use such funds for the retirement of income bonds by purchase of the bonds on the market at prices not above par. However, no matter how able the debtor was to buy the income bonds for itself, there is nothing to show, and no ground to infer, that its inaction in this respect was due to the Fifth Avenue Coach Company's control. During this period, its board had a majority of independent directors free to act without being influenced by any allegiance to the Fifth Avenue Coach Company. The mere fact that the debtor could have made the purchase does not render the stockholders' purchase voidable. A stockholder is under the duty not to use the power that is his by virtue of his stockholdings unfairly to the other stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099; Rothchild v. Memphis & C. R. Co. (C.C.A.) 113 F. 476, certiorari denied Rothschild v. Memphis & C. R. Co., 188 U.S. 740, 23 S.Ct. 848, 47 L.Ed. 677; Gamble v. Queens County Water Co., 123 N.Y. 91, 25 N.E. 201, 9 L.R.A. 527. If the Fifth Avenue Coach Company had actively prevented the purchase of these bonds by the debtor, the nonvoting stockholders might have a proper protest against the Fifth Avenue Coach Company's later purchase. But the debtor had been left free to make the purchase itself if it could. The voting stockholder was not thereby barred by this inaction, not caused by it.

The allegations that the Fifth Avenue Coach Company used inside information to secure an unfair advantage in buying these bonds has no substance. The underlying subsidiary bonds had been bought through advertisements without secrecy. The stockholders must have known what they could expect from a reorganization where they were preceded in interest by income bonds. At the outset their shares had been given an equity of one and a half million and the debtor had piled up a debt larger than this on the unpaid income bonds, leaving these bonds as an outside margin that could expect substantial rights after reorganization. The terms of the announced plan could result in no surprise to one familiar with the company.

■ The appellants contend that the liability of the income bonds might be cut down, since they were only payable in 1965; that they should be considered, at their discounted present value for the purpose of determining the question of insolvency at the time of filing the petition. The principal amount of twenty millions is increased yearly by the interest, and, although not currently payable except out of available net income, it will have increased by unpaid amounts at maturity. To argue that this should be discounted is to ignore the statute (section 63 of the Bankruptcy Act, as amended [11 U.S.C.A. § 103]) which provides for a "rebate of interest upon such [debts] as were not then payable and did not bear interest." However, the statute seems to force a discount of the accrued interest item of $13,000,000. By the terms of the indenture, the accumulated interest did not itself bear interest. Thus that present payment to a creditor, which, if put out at interest would equal thirteen millions in 1965, would be sufficient to discharge the debt.

Nevertheless, that reduction would amount to $10,000,000 at the most, which would not render the debtor solvent unless assets are retained at the December 31, 1934, valuation. There is no warrant for doing this. These are values based on reproduction cost, totally unsuited to be the sole base for the purposes of an insolvency valuation, and further inapt here by reason of the contemplated motorization,

necessitating an appraisal approaching liquidation prices.

As to the specific objection to the write-down between December 31, 1934, and July 31, 1935, of the amount carried as "stock of controlled companies," this represented book value of the subsidiaries owned, at reproduction cost in 1925 of their physical properties, plus subsequent additions at cost and less funded debts outstanding. This item was carried at $9,141,655 in the 1934 statement submitted to stockholders, and the balance sheet of December 31, 1934, attached to the petition, i. e., twenty-two millions as the estimated value of the property less thirteen millions as the outstanding debt, leaving an equity of nine millions which the debtor carried as the value of its stock. These properties were acquired by foreclosure and by merger and entered on the debtor's books of July 31, 1935, at $3,674,488.81, and the stock value, formerly "Investments in Controlled Companies," was written down from nine millions to six dollars. With this, notes and receivables owed by the subsidiaries to the debtor were written off to the amount of $918,391.05, and miscellaneous debits of $435,336.11 were also cut out, so the effect was to cause the debtor's books to show $10,465,971.16 less in this account after July 31, 1935, than they had shown at December 31, 1934. These items, however, were included in the aggregate in the "Fixed Capital" account of July, 1935, at $3,674,488.81, so the net difference was something under seven millions.

The $3,674,488.81 is detailed in the record. It is not a total of the foreclosure prices or the sale prices, at which the property was acquired. The Sixth Avenue and the Christopher and Tenth Street Lines were entered at amounts fixed by the Transit Commission. The Forty-Second Street Line was merged with the debtor and entered in the amount of the 1925 book value. Prior to this merger, however, the Broadway & Seventh Avenue Line had been foreclosed and the property conveyed to the Forty-Second Street Line. The debtor had bought up 4,211 of the Broadway Line's outstanding bonds at 10 per cent. or $421,000, and it bid the property in at foreclosure at $500,000. This amount is not reflected on the schedule in the record. The Bleecker Street Line is entered at $123,342.48, although the debtor had paid $232,000 to buy in bonds of this line held by the public, and had bid $282,000 on the foreclosure sale. The Thirty-Fourth Street

Line is likewise entered at $284,074.99, an amount less than $296,400 the amount spent in buying up bonds or the foreclosure price ($325,000). However, the Twenty-Third Street Line is entered at $558,000, apparently being the foreclosure price plus prior bonds of $150,000 owned by the debtor.

If we take the sale prices and the foreclosure prices of these properties, the total would only be $4,479,143.92. While this includes $600,000 in subsidiaries' debts to this debtor written off at face value, even with this amount it is not sufficient to make us hold the debtor solvent. Though it may be that the foreclosure prices do not fairly reflect the actual value of these properties as parts of the debtor's system or that the debtor's possession of outstanding bonds gave him an advantage over other bidders forbidding competition, it is plain enough that the bonds were for sale at low figures. These prices reflect the values of the underlying properties much more truly than do the book values written off. In the absence of more reliable figures than the 1925 estimate plus subsequent additions at cost, these acquisition prices will be taken.

■ Giving the debtor the benefit of the discount on the accumulated interest on the income bonds, the liabilities as of July 31, 1935, are still at approximately twenty-eight millions and the assets at no more than twenty-five millions.

■ With the debtor thus insolvent, the preferred stockholders are without any right to object to the plan. The sole objecting bondholder did not appeal, and thus the bondholders' rights are not before this court. However, the plan can be reviewed since the preferred stockholders were included in it.

■ The plan proposed provides for a minimum of new mortgage indebtedness to cover the outstanding prior lien bonds, Central Crosstown bonds, and Sixth Avenue bonds. New cash is to be raised by the issuance of equipment obligations and by the sale of new common stock. Each income bond is entitled to 10 shares of new stock and is offered the opportunity to buy 12 more shares at $10, the right to be exercised approximately at the time the plan is consummated. This offering is underwritten by Fifth Avenue Coach Company.

The preferred stock is fairly and equitably treated. It is junior or subordinate to the principal and interest of the income

bonds. For each 10 shares an option is given to buy 2½ shares of new stock at $17.50 a share. This right may be exercised at any time within ten years. If the plan is carried out, there will be issued 203,841 shares to the present income bondholders, and, upon the exercise of their option rights, 244,609 additional shares; 42,633 shares will be reserved for the present preferred stockholders, to be issued upon the exercise of their purchase warrants; 10,000 shares are to be given the. Fifth Avenue Coach Company as compensation. We see no justification for the argument that the treatment of the income bondholders is unfair or discriminates in their favor as against the preferred stockholders.

The courts will scrutinize with care all plans of reorganization proposed for insolvent companies to make certain that assets belonging to creditors are not by indirection being diverted to stockholders, but it is obvious here that no such purpose is shown. Stock equity may not be allowed to participate in any plan of reorganization which does not first provide for making creditors whole. Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L. Ed. 931.

Section 77B, subd. (b) (4), of the Bankruptcy Act (11 U.S.C.A. § 207 (b) (4), provides that no participation need be afforded to stockholders in the event that the debtor be insolvent. Subdivision (e) (1), 11 U.S.C.A. § 207 (e) (1), expressly provides that the acceptance of a plan by the stockholders "shall not be requisite to the confirmation of the plan * * * if the judge shall have determined * * * that the debtor is insolvent." There was such a determination below properly grounded.

Since the plan had not been confirmed by the court before December 31, 1935, and no extension appears, the Fifth· Avenue Coach Company now has an option to cancel its underwriting. Its commitments from the date of the agreement, March 19, 1935, until December 31st should be read in the light of the present facts. Even though the only testimony on the adequacy of this compensation provided in the written agreement as 10,000 shares of new common stock for the Fifth Avenue Coach Company's agreement to buy at $10 a share all of the stock not taken by the income bondholders was to the effect that it was too small, this cannot be accepted, since it must have considered the Fifth Avenue Coach Company's other obligation, namely, to accept the plan on behalf of the securities it held. Acceptance cannot be regarded alone and should be no factor in computing fair compensation for the agreement to underwrite. This should be reconsidered by the court below, and, if compensation is being provided for in the plan, it should be less than 10,000 shares, namely, such reasonable compensation as is just in the light of the present circumstances.

The decree will be modified to provide for a new fixation of the fair measure of compensation for this service; otherwise the decree is affirmed.