### In re CHICAGO, G. W. R. CO.
### No. 58970.

District Court, N. D. Illinois, E. D.
Sept. 9, 1939.

Winston, Strawn & Shaw, of Chicago, Ill., for trustees of debtor.

Larkin, Rathbone & Perry, of New York City, and Gilruth, Beck & McConnell, of Chicago, Ill., for Central Hanover Bank & Trust Co.

Root, Clark, Buckner & Ballantine, of New York City, and Wilson & McIlvaine, of Chicago, Ill., for Guaranty Trust Co. of New York.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and Follansbee, Shorey & Schupp, of Chicago, Ill., for first mortgage bondholders protective committee—Hagerty Committee.

Percival E. Jackson, of New York City, and Vernon R. Loucks, of Chicago, Ill., for certain first mortgage bondholders—Gaston group.

Henry J. Aaron and Charles Aaron, both of Chicago, Ill., for preferred stockholders protective committee.

Ryan, Condon & Livingston, of Chicago, Ill., for common stockholders protective committee.

Florence de Hass Dembitz, of Washington, D. C., for Reconstruction Finance Corporation.

WOODWARD, District Judge.

On June 9, 1939, this Court took under advisement the matter of the approval or disapproval of the plan of reorganization for the Chicago Great Western Railroad Company, debtor, certified to it by the Interstate Commerce Commission. I have concluded that said plan of reorganization should be approved, and pursuant to subsection (e) of section 77 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 205(e), I am filing this opinion stating my conclusions and my reasons therefor.

To give this opinion completeness and clarity I shall briefly state the history of these reorganization proceedings. On February 28, 1935, the debtor, which then was and now is, a railroad corporation within the meaning of said section 77 subject to the territorial jurisdiction of this Court, being in financial distress, filed its petition for reorganization with this Court and the Interstate Commerce Commission. On the same day this Court approved said petition as properly filed and allowed debtor to remain in possession and to operate its properties under the control of this Court.

In August, 1935, section 77 was amended so as to require the appointment of trustees in these proceedings, and, accordingly, after due notice and hearing, this Court appointed as trustees Patrick H. Joyce, president of the debtor, and Luther M. Walter, who never at any time had any connection with the debtor or any of its subsidiaries. After the ratification of these appointments by the Interstate Commerce Commission and the approval of the trustees' bonds by this Court, said trustees on December 1, 1935 began the operation of and have since continued to operate the debtor's property subject to the control and direction of this Court.

Shortly after the approval of debtor's petition Guaranty Trust Company of New York, trustee under debtor's first mortgage, and three protective committees representing the holders of debtor's first mortgage bonds, preferred stock and common stock, respectively, were allowed to intervene generally and become parties to these proceedings. Later, in April, 1938, a group of less than twenty-five holders of debtor's bonds represented by George A. Gaston, et

al., were also permitted to intervene and become parties.

Pursuant to the provisions of section 77 and certain orders of this Court the debtor prepared and later filed with the clerk of this court lists of stockholders, bondholders and creditors containing the information required by the statute.

For good cause shown, this Court extended the time within which debtor was required to file a plan of reorganization for a period of six months from February 27, 1936, and later extended such time to October 1, 1936. On September 29, 1936, debtor filed its proposed plan of reorganization with this Court and with the commission. In accordance with said subsection (d) of section 77 the commission, after due notice to all stockholders and creditors, held public hearings on December 8, 1936, and April 6 and 7, 1937. Debtor having amended its plan pursuant to authority of this Court, the commission held a hearing on October 13, 1937, on said amended plan. A proposed report was issued by an examiner of the commission, exceptions thereto were filed by various parties to the proceedings before the commission, and oral arguments were heard by the commission.

On August 4, 1938, the commission issued its original report and order approving a plan of reorganization and transmitted a copy thereof under the seal of the commission to this Court, and said report and order were filed herein on August 17, 1938, and became a part of the record herein. On October 3, 1938, the common stockholders committee and the preferred stockholders committee filed their respective petitions with the commission asking a rehearing and the modification of said report and order. These petitions were denied on November 7, 1938. On January 25, 1939, the common stockholders committee filed a further petition with the commission asking for a stay of approval of the plan of reorganization theretofore approved by the commission and asking for a modification of said plan. This petition was denied on February 17, 1939.

On December 29, 1938, debtor filed its petition requesting a modification of the plan of reorganization theretofore approved by the commission or, in the alternative, the entry of an order on the commission's own motion modifying said plan of reorganization. This petition was denied on April 17, 1939, but on the same day the commission on its own motion issued its supplemental report and further order approving a modified plan of reorganization which in its opinion satisfied the requirements of section 77 and was compatible with the public interest. Said order of April 17, 1939, revoked and rescinded the original order of August 4, 1938. The supplemental report and further order of the commission were issued by the commission prior to certifying to this Court the plan of reorganization approved by it together with a transcript of the proceedings before it as required by subsection (b) of section 77. The commission, thereafter, certified to this Court said modified plan of reorganization together with a transcript of the proceedings before it and a copy of the supplemental report and further order of April 17, 1939, approving said modified plan, which were filed in this proceeding by the clerk of this Court on April 22, 1939, and became a part of the record herein.

On May 8, 1939, this Court, pursuant to the provisions of subsections (e) and (c) (8) of section 77, entered its order fixing the time within which objections to the modified plan of reorganization for debtor approved by the commission and claims for equitable treatment might be filed herein, fixing the time within which claims might be filed for expenses and fees incident to the reorganization, fixing June 9, 1939, as the date for the hearing of said objections and claims and providing for the giving of due notice to creditors, stockholders and all other parties in interest by the trustees.

Notice of the entry of said order of May 8, 1939, was given by the trustees in accordance with the directions of this Court contained in that order and, pursuant to said order, objections to said modified plan of reorganization and claims for equitable treatment were filed by and on behalf of the preferred stockholders committee, common stockholders committee, and E. V. Manuel, a bondholder. A hearing was held on June 9, 1939, at which all parties in interest were afforded an opportunity to be heard in support of and in opposition to such objections and claims for equitable treatment.

At that hearing counsel for the preferred stockholders committee and the common stockholders committee appeared and argued in support of the objections and claims for equitable treatment of their respective committees, and attorneys for

the Hagerty bondholders committee and the Gaston bondholders group argued in opposition thereto. The preferred stockholders committee called one witness, who testified in support of their claims for equitable treatment.

As required by said order of May 8, 1939, petitions for allowances of fees and expenses were filed by all of the intervenors herein and, in addition, by Reconstruction Finance Corporation and Central Hanover Bank and Trust Company as trustee under the first mortgage of Mason City and Fort Dodge Railroad Company. These petitions were referred to the commission for the purpose of fixing maximum limits of such allowances. After a hearing at which testimony was presented in support of and in opposition to such petitions, the commission, on August 29, 1939, made its report and order fixing such maximum limits. A certified copy of the report and order of the commission were filed with this Court and are a part of the record before me.

In passing upon the approval or disapproval of the plan of reorganization certified by the commission and the objections thereto and claims for equitable treatment filed by the preferred and common stockholders committees and said E. V. Manuel, I have considered not only the testimony offered at the hearing, but also the evidence and facts contained in the entire record in this proceeding, including the transcript of the proceedings before the commission, and I have concluded that the findings of fact made by the commission in its original report of August 4, 1938, as modified by its supplemental report of April 17, 1939, are fully supported by the evidence and are correct. Consequently, in this opinion I shall discuss at length only the major points urged at the hearing before this Court.

The financial structure of the debtor company is simple. It has outstanding in the hands of the public four per cent bonds in the principal amount of $35,544,000 which are secured by a first mortgage on the properties of the debtor, except certain terminal properties at Minneapolis; and also has pledged with the Reconstruction Finance Corporation $5,000,000 principal amount of said first mortgage bonds to secure an indebtedness of $1,288,162 principal amount and interest thereon and has pledged with Railroad Credit Corporation $4,233,000 principal amount of said bonds to secure an indebtedness of $1,093,885.24 principal amount and interest thereon. In addition, debtor, as part payment of the purchase price for certain terminal properties at Minneapolis, has assumed payment of $500,000 principal amount of 3½ per cent bonds of Wisconsin Central Railway Company which are secured by a first mortgage on said properties. The only other long-term debt of the debtor consists of $1,623,000 principal amount (at June 30, 1939) of equipment trust certificates issued prior to the institution of the reorganization proceedings and $1,991,306.07 principal amount (at June 30, 1939) of equipment obligations issued by the debtor and the trustees during the pendency of these proceedings with the approval of this Court and the commission.

No interest has been paid on debtor's first mortgage bonds since September 1, 1934, at which time only half of said interest was paid. The amount of interest accrued on said bonds to January 1, 1938, the date on which the plan approved by the commission is to become effective, is $5,094,640. Pursuant to authority granted by this Court, the interest on the Wisconsin Central bonds and dividends on and maturing instalments of principal of the equipment trust obligations have been paid currently by debtor in possession and later, by the trustees. Interest on the indebtedness to the Reconstruction Finance Corporation has not been paid since the beginning of the reorganization proceedings, and on January 1, 1938, computed on the basis of 4 per cent amounted to $157,460.51. No interest on the loan from the Railroad Credit Corporation has been paid since the beginning of the reorganization proceedings, but the corporation from time to time has applied against such interest amounts due the debtor from the corporation. As of January 1, 1938, the net amount of interest due the Railroad Credit Corporation was $24,494.45.

These reorganization proceedings were necessitated by debtor's inability to pay its fixed charges and the unsecured debt at the time of the institution of these proceedings was not large. Claims against it have been liquidated and paid in the ordinary course of business by the trustees with the approval of this Court and as of June 8, 1939, the total unsecured claims, including those entitled to priority, amounted to only $313,811.16. It seems probable that when these claims are liquidated the amount to be paid will be much less than this figure.

The debtor company has outstanding in the hands of the public $46,073,500 of 4 per cent cumulative preferred stock upon which dividends have accumulated as of July 1, 1939, in the amount of $41,466,150. This stock is of a par value of $100 per share and the accumulated dividends amount to $90 per share. In addition, 10,000 shares of said stock of a total par value of $1,000,000 are held by the Mason City & Fort Dodge Railroad Company, a wholly owned subsidiary of debtor.

The debtor also has outstanding in the hands of the public 452,094 shares of common stock of a total par value of $45,209,400.

Under the plan promulgated by the Interstate Commerce Commission the reorganized company will assume the obligations of the debtor company in respect of the Wisconsin Central first mortgage bonds amounting to $500,000 principal amount, the equipment trust obligations of the debtor company and its trustees amounting to $3,614,306.07 principal amount as of June 30, 1939, and will pay, in cash, the liquidated amount of the unsecured claims of the debtor company which have been discussed above. In addition the reorganized company will pay the reorganization expenses which, so far as they can be ascertained at this time, will not exceed $106,630.73 and will also assume as prior claims and pay in the ordinary course of business the obligations of the trustees and the obligations incurred by the debtor while operating its properties under the control of this Court.

The plan further provides that the present first mortgage and all bonds which have been issued thereunder, together with accrued interest, the preferred stock and accumulated dividends and the common stock of debtor will be cancelled. The reorganized company (which may be the present corporation or a new corporation) will issue or provide for the issuance of the following securities:

(a) New first mortgage bonds to be dated January 1, 1938, to mature in fifty years, bearing interest at the rate of 4 per cent, and secured by a first mortgage on all of debtor's properties, except that portion subject to the lien of said Wisconsin Central mortgage upon which said mortgage shall constitute a second lien. The plan provides that the bonds to be issued under said mortgage, including $500,000 principal amount reserved to refund said Wisconsin Central bonds, shall be limited to $20,000,000. Of these bonds $10,159,660 will be issued at once to the holders of debtor's present bonds and approximately $6,226,690 may be issued to provide $2,050,000 for working capital, to pay in full the secured indebtedness due the Reconstruction Finance Corporation and Railroad Credit Corporation, and to provide the sum of $1,500,000 to purchase certain properties of the St. Paul Bridge & Terminal Railway Company now operated by debtor under a long-term lease at an annual rental of $100,000. The unissued balance of said bonds will be reserved for future financing.

(b) As provided in said plan, if such bonds cannot be sold at par, the reorganized company, in lieu of issuing said $6,226,690 of bonds, may borrow a sufficient amount for said purposes from Reconstruction Finance Corporation or any other source, and issue its note therefor secured by the pledge of such new bonds in an amount equal to 125 per cent of the principal of said loan or in such other amount as may be required. In the present state of the money market it is improbable that the reorganized company will be able to sell its first mortgage bonds at par and will be required to borrow the funds for such purposes upon its secured note. Upon this assumption, immediately after consummation of the plan, there will be $10,159,660 of new first mortgage bonds outstanding in the hands of the public and approximately $7,784,000 of said bonds pledged to secure said note.

(c) General income mortgage bonds dated January 1, 1938, maturing in one hundred years, bearing interest at the rate of 4½ per cent and secured by a mortgage having a lien junior to that of the first mortgage. Such issue of bonds shall be limited to $6,500,000 of which $6,095,796 will be issued under the plan. Interest on said bonds shall be paid only out of "defined income" as defined in said modified plan, but shall be cumulative, whether or not earned, up to a maximum of 13½ per cent of the principal amount of the outstanding bonds.

(d) Five per cent preferred stock having a par value of $50 per share upon which the dividends shall be cumulative from and after January 1, 1941, whether earned or not, to the extent of 15 per cent of the par value of the stock from time to time outstanding. The authorized issue of

said stock will be 500,000 shares, of which approximately 365,748 shares having a total par value of $18,287,400 will presently be issued.

(e) Common stock having a par value of $50 per share. There shall be 500,000 shares authorized of which approximately 352,284 shares having a total par value of $17,614,200 will presently be issued.

The treatment to be accorded creditors, other than holders of first mortgage bonds, of the debtor company has ·already been stated. The holders of said bonds will receive for the full amount of the principal of such bonds and interest to January, 1, 1938, the date as of which the plan is to be made effective, the following securities: $285 principal amount of first mortgage 4 per cent bonds (25%), $172 principal amount of general income mortgage 4½ per cent bonds (15%), $515 par value of 5 per cent preferred stock (45%), and $172 par value of common stock (15%).

The preferred stockholders will receive for each two shares, together with accumulated dividends, one share of the common stock of the reorganized company. Since the commission has found that the common stockholders of the debtor have no equity in the property (which finding I shall later discuss) the plan provides that they receive nothing for their present stock.

This brings me to a consideration of the various objections to the plan and claims for equitable treatment.

The first of these which I shall take up is the contention made by the common stockholders' committee in their exceptions to the Examiner's report and their petitions filed with the commission and again presented at the hearing before this court that the interest of the common stockholders in debtor's property should be preserved and that they should be permitted to participate in the distribution of securities of the reorganized company. In support of this contention they urged, first, that section 77 of the Bankruptcy Act is a composition statute and that without regard to the value of their present equity in debtor's property they are entitled, as a matter of law, to retain an interest in the property of the debtor; second, that upon a proper valuation of the property there remains an equity for the stockholders; and, lastly, they insisted that even if the first two points were resolved against them, they should be given options or warrants to re-

ceive or subscribe for the stock of the reorganized company.

■ An examination of section 77 in the light of the history of railroad reorganizations and the purposes of the act shows that the ·first contention of the common stockholders cannot be sustained. Prior to the enactment of section 77 the reorganization of railroads had been effected through the medium of equity receiverships. This method was inadequate because of the time consumed and because the property often emerged from reorganization with fixed interest obligations which resulted in another receivership within a relatively short time. Section 77 was intended to remedy these and other evils inherent in equity receiverships.

■ One of the fundamental reasons for this delay and for the insufficient paring down of interest charges was the lack of power of a court of equity to bind dissenting bondholders and other creditors to a plan of reorganization which altered or modified their strict legal rights. The courts, without the consent of these interests, were in most instances powerless to effect plans of reorganization which were economically sound. Often such consent was impossible to obtain and frequently it was expedient to make unwarranted concessions to junior creditors and even to stockholders.

In the evolution of bankruptcy and insolvency proceedings, Congress, shortly after the Civil War, had added a section to the Bankruptcy Act embodying the principles of common law composition implemented with provisions making a fair composition binding upon minority dissenting creditors who could not be bound at common law. The constitutionality of this extension of the bankruptcy power was sustained. In re Reiman, 20 Fed.Cas. 490, Fed.Cas. No. 11,673; Hanover National Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113. It was only natural, therefore, that Congress, in casting about for some method of removing the . principal stumbling blocks in the path of sound railroad reorganizations, should turn to the bankruptcy clause as a source of power to remedy this evil. The result was Section 77.

While the validity of Section 77 has been upheld on the ground that a plan of reorganization, when confirmed, is no different in principle from the composition provisions of the Bankruptcy Act (Con-

tinental Ill. Nat. Bank v. Chicago Rock Island Railway Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110), it does not follow that this section has all of the attributes of bankruptcy composition. The Supreme Court held no more than that reorganizations, like compositions, were within the bankruptcy power. The case cannot be said to hold that reorganization and composition are or must be identical. The latter was an outgrowth of and modeled after common law composition, where the equity owner of the property was left in possession and only the rights of unsecured creditors were modified. Section 77, however, evolved from equity receiverships. It is a hybrid product in which Congress seemingly has attempted to preserve the flexibility and other desirable features of the equity process, supplemented and improved by certain provisions available only in bankruptcy. The principal contribution of the composition section is the provision that dissenting minority creditors and stockholders may be bound by the approval of the requisite majority.

The Supreme Court, in the case of Callaghan v. Reconstruction Finance Corp., 297 U.S. 464 at page 470, 56 S.Ct. 519, 522, 80 L.Ed. 804, in considering the allowance of certain fees under section 77B, 11 U.S. C.A. § 207, a statute similar to section 77, 11 U.S.C.A. § 205, said: "Reorganizations now permitted under section 77B present certain resemblances to compositions under section 12 [11 U.S.C.A. § 30] which have been commented upon as supporting the constitutionality of the reorganization provisions of section 77 or section 77B (11 U. S.C.A. §§ 205 or 207). Continental Ill. Nat. Bank v. Chicago, R. I. & P. Ry. Co., supra; In re Central Funding Co. [2 Cir.], 75 F.2d 256; Campbell v. Alleghany Corp. [4 Cir.], 75 F.2d 947. But section 77B contemplates a procedure and results not permissible under section 12. Reorganizations are nowhere referred to in the statute as compositions."

Not only is the genesis of section 77 different from that of the composition section of the act, but its scope is much broader. It has always been implicit in a composition, and is specifically provided in the arrangement section of the present act, that only the rights of unsecured creditors may be affected, but under section 77 authority is given to modify the rights of any and all classes of creditors, secured or unsecured, and the rights of stockholders as well. This fundamental difference indicates that section 77 is not a composition statute in the sense that the business must be preserved to existing stockholders and in my opinion the contention of the common stockholders to this effect cannot be sustained.

Section 77 impliedly recognizes that stockholders and even creditors may be denied participation in the plan. Clause 3 of subsection (b) of section 77 provides that a plan of reorganization "may include, for the purpose of preserving such interests of creditors and stockholders as are not otherwise provided for, provisions for the issuance to any such creditor or stockholder of options or warrants to receive, or to subscribe for, securities of the reorganized company in such amounts and upon such terms and conditions as may be set forth in the plan." The inference from this is clear.

Also, subsection (e) provides that submission of the plan to any class of stockholders whose equity has no value or to any class of creditors whose interests have no value shall not be necessary. If, as contended by the common stockholders in this proceeding, they are entitled, as a matter of right, to participate in the distribution of the securities of the reorganized company whether or not their equity has a value, it is improbable that congress would have provided that they should have no voice in determining whether or not the plan was fair and should be made effective merely because there was no such value.

Subsection (l) of section 77 provides that, to the extent consistent with the other provisions of that section, "the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and its property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered." In proceedings for the adjudication of bankrupts the relative priorities of the various classes of creditors has always been recognized, and stockholders or individual bankrupts cannot participate. The provisions of section 77 are not inconsistent with this principle.

For the foregoing reasons I have concluded that the commission in promulgating the present plan of reorganization correctly gave effect to the relative priority of the various classes of creditors and interests in providing for the distribution of the assets of the reorganized company and

correctly found that the common stockholders do not have a right, as a matter of law, to participate in the plan. This conclusion is strengthened by decisions under section 77B, 11 U.S.C.A. § 207, which in many ways is similar to section 77. In the case of Callaghan v. Reconstruction Finance Corporation, quoted from above, the Supreme Court in effect stated that section 77B is not a composition statute.

In the following cases the Courts have held that a plan of reorganization may be confirmed under section 77B which does not provide for participation by any stockholders (or a junior class of stockholders) when their equity is of no value: In re 620 Church Street Building Corporation, 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16, In re National Food Products Corp., D.C., 23 F. Supp. 979, In re Consolidation Coal Co., D. C., 11 F.Supp. 594, In re New York Railways Corp., 2 Cir., 82 F.2d 739, (certiorari denied, 298 U.S. 687, 56 S.Ct. 959, 80 L.Ed. 1406), and in the following cases have held that a plan may not be confirmed which allows stockholders having no equity to participate in the distribution of securities: In re Day & Meyer, Murray & Young, 2 Cir., 93 F.2d 657, In re Barclay Park Corp., 2 Cir., 90 F.2d 595, Price v. Spokane Silver & Lead Co., 8 Cir., 97 F.2d 237.

■ From what I have said, however, it should not be inferred that the creditors are entitled as a matter of right to receive the same character of securities that they now possess. The very purpose of reorganization would be destroyed if this were true. It is a matter of common knowledge that one of the reasons why the railroads have so often been in financial difficulties, particularly during the times of economic stress, is the relatively large proportion of the indebtedness represented by fixed interest obligations. In the past equity receiverships have not resulted in paring down these obligations in a sufficient amount, and congress by the enactment of section 77 sought, among other things, to remedy this situation. One of the requisites under a plan of reorganization under the statute is that it "shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings, experience and all other relative facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof." Likewise, the statute provides specifically that the plan "shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, * * *." While the rights of creditors must be modified to the extent necessary to carry out the purposes to be accomplished, the act does not provide specifically or by implication that the relative position of the various creditors or stockholders may be affected.

■ The common stockholders argued at length that since subsection (b) provides that the plan "shall" include provisions modifying or altering the rights of creditors or any class of them and "may" include provisions modifying or altering the rights of stockholders or any class of them, it was intended that under all circumstances the stockholders should be given recognition. Such a construction would be inconsistent with the other provisions of the act. A better explanation is that congress did not want to leave to chance the paring down of fixed obligations which in most cases would be necessary to put the reorganized company on a sound financial basis and therefore made the provision mandatory as to creditors. Since the interests of stockholders do not carry fixed charges it was not necessary to include mandatory provisions with respect to altering their rights.

■ The common stockholders also argued that the debtor had proposed a plan of reorganization which provided that the common stockholders should participate in the distribution of securities and that the other parties in interest had either made similar proposals or had acquiesced in that made by the debtor and contended that the commission was obligated to give effect to this agreement of all the interests in the proceeding. Quite aside from whether or not such an agreement was actually made (which is contested), there is no merit to this contention, because subsection (d) of the act provides that the commission "shall render a report and order in which it shall approve a plan, which may be different from any which has been proposed, * * *."

■ The second major point which the common stockholders argued is that the intrinsic value of the property is sufficiently great to permit them to participate in the reorganization, even though creditors and preferred stockholders are given full

priority in the distribution of new securities. The preferred stockholders also attacked the valuation made by the commission on the ground that it did not give sufficient weight to the probable future increase in earnings. There is no merit to these contentions.

Subsection (e) provides in part: "The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts."

The highest value of debtor's property shown of record in this proceeding is the book value as shown by the balance sheets of the company. It is not unfair to the stockholders to assume that this figure represents the original cost of the property less such depreciation as has been permitted or required under the accounting rules of the commission. The balance sheet as of May 31, 1939, shows the total book value of debtor's property to be $148,085,590. This balance sheet shows that as of the same date the liabilities of the company, excluding preferred stock owned by debtor's subsidiary and all common stock, amounted to $106,129,647. The balance sheet, however, does not show accumulated dividends on the preferred stock amounting, on June 1, 1939, to $41,005,415, which the preferred stockholders would be entitled to receive prior to any payment of dividends or distribution of assets to the common stockholders. On the basis of book value alone, after deducting the accumulated dividends, the common stockholders would have an equity in the property of only $950,528 as of that date. If the balance sheet of June 30, 1939, is used, the total book value of such property would be $147,792,016. After deducting liabilities of $60,133,234 and the par value of the preferred stock held by the public and the accumulated dividends thereon which then totaled $87,539,650, the common stockholders' equity as of the later date would amount to only $119,132.

But in determining whether or not common stockholders have an equity other elements of value must be taken into consideration. One of these is the present cost of reproduction new less depreciation. The debtor introduced evidence to the effect that as of September 30, 1936, the present cost of reproduction new of debtor's property and that of its subsidiaries, less depreciation, was $89,844,435. The valuation placed upon the properties of the debtor and its subsidiaries for rate making purposes by the commission under section 19a of the Interstate Commerce Act, 49 U. S.C.A. § 19a, including non-carrier property and working capital, at June 30, 1916, plus net additions and betterments to September 30, 1936, was $79,375,170. Upon either of these bases there is no equity in the common stock.

But the value of railroad property cannot be determined alone by consideration of book value, original cost, cost of reproduction new less depreciation, or by the value of the property for rate making purposes. Railroad property is not bought and sold like ordinary commodities. Its principal value is determined by its present and prospective earning power, upon which its past earning power throws much light. In 1909 the properties of Chicago Great Western were reorganized. Since that time the earnings have never been sufficient to pay any dividends to the common stockholders and, except in one year when there was approximately $9,300 available to pay dividends on stock with a par value of approximately $45,000,000, nothing has been earned on such stock. Since 1909 the preferred stockholders have received total dividends of only 10 per cent of the par value of their stock. Dividends on the publicly held preferred stock as of July 1, 1939, have accumulated to the extent of $90 per share. The debtor found it necessary to borrow approximately all the money needed to pay interest for two years prior to the commencement of these proceedings. These facts indicate generally that on the basis of past earnings the intrinsic value of outstanding common stock of debtor is nil.

The commission made a careful study of the earnings of the company, past, present and prospective. In its modified report of April 17, 1939, it found that the earnings available for all fixed charges for the ten years beginning 1929 were as follows: 1929, $3,035,442; 1930, $3,048,374; 1931, $2,737,216; 1932, $567,545; 1933, $1,437,154; 1934, $1,326,514; 1935, $1,421,732; 1936, $2,310,500; 1937, $996,420; and

1938, $710,517. The ten year average was $1,759,141. This average capitalized on a basis of five per cent gives a value of a little over $35,000,000.

In its original report the commission found that the debtor's average annual income available for fixed charges during the 15-year period from 1922 to 1936, capitalized on the same basis, gave approximately $44,000,000. The highest earnings in any one year in that period thus capitalized give a value of $61,000,000. The highest earnings of the property for the future forecast by any of the witnesses was for the year 1941, which if so capitalized would show a value of $57,000,000.

█ With the foregoing elements of value and other facts before it, the commission reached the conclusion that approximately $62,000,000 represented the value of assets that would be devoted by the reorganized company to the service of transportation. It was urged at the hearing before this court that this valuation of property by the Interstate Commerce Commission, particularly in view of the provisions of subsection (e) of section 77, was an administrative finding which is binding on this court. I find it unnecessary to decide this question, because I concur in the conclusions reached by the commission both as to the worth of the property and the lack of equity in the common stock.

█ As above stated, the common stockholders also urged that the commission erred in refusing their alternative request that they be given options or warrants to purchase common stock of the reorganized company. Their position was that it was only fair that they be given an opportunity to salvage some of their losses if in the future prosperity should come to the property. I approve of the action of the commission. In the light of the earning history of the company I cannot see that the future earnings will ever be sufficient to give such warrants any actual value. The value, if any, of such options would be based upon purely speculative possibilities. Subsection (d) of section 77 requires the commission approve a plan of reorganization which will be compatible with the public interest. Public interest would not be served by the issuance of options which have no intrinsic value.

The value of debtor's assets and the total allowable capitalization for the reorganized company discussed above permits the immediate issue of only 230,368 shares of $50 par value common stock to the present preferred stockholders. Those stockholders receive shares having a total· par value of $11,518,400 out of a total issue of $17,614,200 of such stock with approximately $44,880,000 of prior securities ahead of them. This stock is given them for a total claim of $87,539,650 including accumulated dividends. It is self-evident that this treatment does not fully compensate them. It would be unfair to allocate anything of value to the present common stockholders prior to full settlement of the preferred stockholders' interests. Eagleson v. Pacific Timber Co., D.C., 270 F. 1008, In re Parker-Young Co., D.C., 15 F. Supp. 965, In re National Food Products Co., D.C., 23 F.Supp. 979. See also the findings and opinion .of the Securities and Exchange Commission In the Matter of Utilities Power & Light Corporation, July 26, 1939, pp. 26–7.

█ At the hearing before this court the preferred stockholders urged that the court refuse to approve the plan promulgated by the commission because it provided for the issuance of common stock of the par value of $50 per share instead of a par value of $25 per share. This objection was also made but not argued by the common stockholders' committee, who would also increase the par value of the new preferred stock to $100 per share. Evidence was introduced by the preferred stockholders to show that two shares of such common stock of a par value of.$25 would have a greater market value than one share having a par value of $50. It was developed on cross examination, however, that the added value of the two shares was due to the fact that the value of any common stock of debtor immediately following reorganization will be speculative and would be increased through more active trading. The equity in the property represented by a share having a par value of $50 and its intrinsic value would be the same as the equity and the intrinsic value of the two shares. The preferred stockholders are not, as a matter of right, entitled to securities of a par value that will produce the greatest speculative value. Under the plan the bondholders will receive approximately sixty five per cent in amount of the total securities issued or assumed by the reorganized company, and will receive approximately the same proportion of the voting securities. If the par value of the common stock were reduced to $25 per share and the preferred stock left at $50 per share, as

requested by the preferred stockholders, the bondholders would receive only approximately fifty seven per cent of the total voting securities. The conclusion of the commission that the par value of the common stock should be $50 is fair and should be approved.

The preferred and common stockholders' committees both contend that the commission erred in giving the bondholders new income bonds bearing interest at the rate of 4½ per cent and preferred stock with dividends of 5 per cent. Their position is that it is inequitable for the bondholders to receive securities which may yield a greater return than the bonds which they surrender. While it is true that the potential yield of the securities of the new company received by the bondholders is greater than the yield which they could receive upon the securities which they hold in the old company, it should not be overlooked that to the extent of three-fourths of the amount to which they are entitled they are giving up obligations secured by a first lien on most of debtor's property in exchange for an equal amount of junior securities. The income bonds which they will receive will be secured by a second mortgage and the preferred and common stock which they will receive will be unsecured. The investing public demands a higher yield on such securities than on first mortgage bonds. In view of their prior position and the sacrifice of security and fixed return which they are called upon to make, the bondholders are entitled to junior securities carrying a rate of return sufficient to give them a market value near their face or par value when earnings are sufficient to pay the interest or dividends thereon. Also, in the light of debtor's earnings, history, and prospective earnings, it seems probable that such increase will be necessary to ensure an average return of 4% on their new securities.

What I have said with respect to the increased rates of return on the junior securities to be given bondholders applies with equal force to the objections of the preferred stockholders to the provisions for limited accumulation of interest on income bonds and dividends on preferred stock.

The preferred stockholders also urged that the plan was defective because it treated accrued interest on and principal of the first mortgage bonds as one. They argue that this will result in the bondholders receiving compound interest. Under the mortgage the principal and interest on the bonds are both secured by a first lien upon the properties of the debtor. From the standpoint of priority, they are secured debts of equal rank and should be accorded the same treatment. The fact that there will be some compounding interest does not condemn the plan, since this is inherent in the refunding of the debts of almost any company which has been unable to meet its fixed interest charges.

The preferred stockholders also urged that the allowable claim of the bondholders for interest during the period after the commencement of the reorganization proceedings should be reduced to the extent of capital payments made upon equipment during that period and further reduced to the extent that interest was paid but not earned during 1932, 1933 and 1934. The common stockholders urged that the bondholders' claim for interest should be allowed only to the extent that such interest has been earned during these proceedings. The amount of interest due the bondholders is fixed by the terms of the bonds and the mortgage securing them, and will continue to accrue until the rights of the bondholders are changed by the confirmation of a plan of reorganization. In the present case the obligation of the debtor to pay interest is fixed, and is in no way affected by the fact that debtor paid its interest with borrowed money, or paid for equipment upon which the bondholders may later obtain a lien under the terms of the mortgage, or failed to earn that interest during reorganization.

Objection was also made by the common stockholders to the establishment of sinking funds for first mortgage and income bonds. Various other general objections were urged. I have examined all of them, and I find them to be without merit. A discussion of each of them is unnecessary.

All of the objections to the plan of reorganization and claims for equitable treatment filed herein should be overruled and denied.

I have examined the plan certified by the commission and the supporting evidence. I have also considered the rights and interests of the various parties and the future welfare of the debtor. In my opinion, the commission has promulgated a plan of reorganization which is fair and which

162

is economically and financially sound. It is in the interest of the public and of the various security holders entitled to participate in this reorganization. I am satisfied that it complies with all of the provisions of subsections (b) and (e) of section 77 and should be approved.

 Under the provisions of subsection (c) (12) I am powerless to make an allowance in excess of the maximum limits set by the commission. At this time such limits are in effect the approximate amounts to be paid by the reorganized company for fees and expenses incident to this reorganization and, accordingly, I find that such amounts have been fully disclosed so far as they can now be ascertained, are reasonable, are within the maximum limits set by the commission, and, within such limits, are subject to the approval of this court. I also find that the plan provides for the payment of all costs of administration and allowances.

 The commission has found that certain classes of creditors enumerated in its order (which I shall not repeat) are not materially or adversely affected by the plan. I have reviewed this finding and believe that it is correct and should be affirmed. Under the provisions of section 77 submission of the plan to such classes of creditors is not required. The only classes of creditors or stockholders to which the plan must be submitted are the first mortgage bondholders and the preferred stockholders and adequate provision has been made for the evidencing of their claims or interests.